**In re COPLEY PHARMACEUTICAL, INC., "Albuterol" Products Liability Litigation**

**MDL No. 1013.**

United States District Court, D. Wyoming.

April 25, 1995.

Stanley M. Chesley, Janet G. Abaray, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, Paul Rheingold, Rheingold & McGowan, New York City, Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Robert R. Rose, Jr., Robert R. Rose, III, Michael R. O'Donnell, Rose, Rose & O'Donnell, Cheyenne, WY, for plaintiffs; J. Douglas McCalla, Spence, Moriarity & Schuster, Jackson, WY, on the brief.

Sheila Birnbaum, Skadden, Arps, Slate, Meagher & Flom, New York City, Bruce A. Menk, Hall & Evans, Denver, CO, Herbert Dym, Covington & Burling, Washington, DC, Thomas A. Nicholas, III, Thomas G. Gorman, Hirst & Applegate, Cheyenne, WY, for defendants.

## ORDER DENYING DEFENDANT'S MOTION TO DECERTIFY THE CLASS AND THE COURT'S TRIAL PLAN

BRIMMER, District Judge.

The above-entitled matter comes before the Court on the Defendant's Motion to Decertify the Class and the Plaintiffs' opposition thereto, and the trial plans submitted by the parties, and the Court, having reviewed the relevant materials on file herein, having heard the oral arguments of the parties and being fully informed in the premises, FINDS and ORDERS as follows:

### Background

This case involves a national class action product liability lawsuit against Defendant Copley Pharmaceutical, Inc. A history of the case can be found in the Court's Order Granting Partial Class Certification. *In re Copley Pharmaceutical, Inc.*, 158 F.R.D. 485 (D.Wyo.1994). Copley manufactures generic drugs including Albuterol, a bronchodilator prescription pharmaceutical. Copley's Albuterol was the subject of a nationwide recall in January 1994 after contamination was discovered in its Albuterol 0.5% solution. The exact nature, cause and extent of this contamination remains the subject of much controversy and is one of the issues pending before this Court.

Following the recall, Copley was named in a large number of lawsuits filed throughout the United States. Ultimately the Judicial Panel on Multidistrict Litigation consolidated all the federal cases brought against Copley in this Court. On July 18, 1994, this Court held an initial status conference in which it appointed a Plaintiffs' Steering Committee

(PSC) to coordinate discovery with Copley. The PSC, with some dissention from other plaintiffs' counsel, filed an Amended Class Action Complaint and asked the Court to certify the case of *Holmes, et al. v. Copley*, 94–MD–1503 as a class action.

On October 28, 1994, the Court issued its Order Granting Partial Class Certification. *See In re Copley, supra.* In that Order the Court recognized the presence of several common threshold issues affecting the class:

(1) Were the Defendant's manufacturing processes defective?

(2) Was the Defendant negligent in its manufacture and distribution of Albuterol?

(3) Did the Defendant breach any warranties in selling its product? and,

(4) Are *pseudomonas fluorescens* or other possible contaminants dangerous to the human body?

*Id.* at 489. The Court also held that individual issues of causation and damages were present and that those issues were not proper for class adjudication. *Id.* at 492. Balancing these considerations under Fed. R.Civ.P. 23(c)(4)(A), the Court certified the class under Fed.R.Civ.P. 23(b)(3) for the following common issues of liability: strict liability, negligence, negligence per se, breach of warranties, and declaratory relief. *Id.* at 493.

The Court's approach was influenced, in part, by a similar holding by Judge Grady in his certification of another partial class action brought by hemophiliacs against blood products manufacturers. *See, Wadleigh v. Rhone–Poulenc Rorer, Inc., et al.,* 157 F.R.D. 410 (N.D.Ill.1994). In the intervening six and a half months, Copley neither appealed this Court's class certification nor moved for reconsideration.

Subsequent to the class certification, this action has moved forward with surprising speed and efficiency. For the most part, counsel on both sides have cooperated to coordinate discovery and minimize the delays that can plague national products liability actions. *See, e.g. In re School Asbestos Litigation,* 789 F.2d 996 (3d Cir.1986), *cert. denied,* 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986). In fact, discovery has continued even though Copley has become the focus of a grand jury investigation in Massachusetts. Plaintiffs and the Defendant have cooperated to provide notice to the class, and those wishing to opt-out did so prior to March 15, 1995. Currently the matter is set for a final pretrial conference on May 30, 1995, and trial is scheduled for June 12, 1995.

Pursuant to Management Order Number Six, the parties submitted their trial plans on April 17, 1995. These plans will be discussed in more detail below. Along with its trial plan, Copley filed the pending Motion to Decertify the Class. In that motion, Copley argues that the Court should decertify the class because the Seventh Circuit reversed Judge Grady's class certification in *Wadleigh. See, In re Rhone–Poulenc Rorer Inc., et al.,* 51 F.3d 1293 (7th Cir.1995). Based largely on that decision, Copley has submitted two arguments for class decertification. First, Copley contends that its Seventh Amendment rights will be infringed by the Court's bifurcated trial plan. Second, Copley argues that the class is unmanageable because it is impossible for the Court to consider the laws of fifty-one different jurisdictions. Plaintiffs argue in reply that the class certified by the Court is not only constitutional and manageable, but is also the fairest way to resolve the common issues facing the class. Plaintiffs also suggest that the Defendant's motion is motivated by a desire to dissipate the resources of the Plaintiffs, thereby preventing many of them from pursuing claims.

The Court held a hearing on the motion and the trial plans on April 21, 1995. After careful consideration of Copley's arguments, the *Rhone–Poulenc* decision, and the Court's fiduciary duty to the class, the Court is confident that its class certification remains legally sound. In its October order the Court noted the difficulty in deciding whether to certify the class at that early stage of the litigation. *In re Copley,* 158 F.R.D. at 488. After dealing with this class through many more hours of hearings over the last seven months, the Court is even more convinced that the class certification of some common issues is necessary and judicially efficient.

## I. Defendant Copley's Motion to Decertify the Class

As mentioned above, Copley's motion to decertify makes two arguments: (1) the Seventh Amendment precludes submitting the elements of liability to separate juries, and (2) a trial would be unmanageable because the Court would be required to apply the differing laws of all fifty states. It is clear from the tone and substance of these arguments that they are inspired by the decision in *In re Rhone–Poulenc*.[1] Therefore, the Court examines *In re Rhone–Poulenc* to explore its applicability to this case.

### A. In re Rhone–Poulenc Rorer, Inc., et al.

In *Wadleigh, et al. v. Rhone–Poulenc Rorer, Inc.*, 157 F.R.D. 410 (N.D.Ill.1994), the United States District Court for the Northern District of Illinois certified a partial class of hemophiliacs for their claims against four different suppliers of blood products.[2] The basis of the plaintiffs' claim in *Wadleigh* was that the defendants were responsible for the plaintiffs' infections with the Human Immunodeficiency Virus (HIV) through defendants' supply of human blood products. *Id.* at 414. The *Wadleigh* plaintiffs offered two primary theories of liability: (1) even before the defendants knew to test their products for HIV, they should have tested for other viruses which, by their association with HIV, would have prevented much of the contaminated blood from reaching the plaintiffs, and (2) even after the defendants were aware of HIV, and that it could be transmitted through blood, the defendants failed to properly screen their product and warn their customers.

Despite individual issues of causation, the Court in *Wadleigh* found that common issues of negligence and breach of fiduciary duty were proper for class certification. *Id.* at 426. The court used its authority under Fed.R.Civ.P. 23(c)(4)(A) and certified a partial class to those particular issues. *Id.*

Defendants sought a writ of mandamus from the Seventh Circuit. Writing for the Court, Chief Judge Posner granted the writ and ordered the district court to decertify the class. *Rhone–Poulenc* at 1304. Judge Posner reasoned that the proposed trial plan had exceeded the bounds of the trial court's discretion. *Id.* at 1299. Judge Posner identified three concerns with the class certified by the district court.

First, the court concluded that even though the defendants had won 92.3% of the previous trials, a class action would force them to settle because a jury of six persons would "hold the fate of an industry in the palm of its hand." *Id.* at 1299. Despite Plaintiffs' lack of success at trial, Judge Posner then concluded that if the plaintiffs win at the class trial each member of the class "is apt to receive a judgment in the millions." *Id.*

The second concern expressed in *Rhone–Poulenc* was the district court's ability, or rather presumed inability, to condense the negligence law of different jurisdictions into one jury instruction, which he hinted might even require the use of Esperanto. The court also expressed doubt that the district court could properly apply the plaintiffs' "serendipity" theory of liability.[3] *Id.* at 1301. Judge Posner concluded that the nuances present in various states' negligence laws and professional duty of care laws made the class unmanageable. *Id.* The court also suggested that such an effort to condense the various state laws would be a violation of *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

---

1. It is unclear, however, how much the timing of this motion was affected by the *In re Rhone–Poulenc* because Copley waited for over one month after the Seventh Circuit's decision to act. With the trial less than two months away, Copley's decision to delay its motion to decertify is somewhat suspect.

2. The Court will refer to Judge Grady's decision as "Wadleigh" to distinguish it from the Seventh Circuit's decision in "Rhone–Poulenc."

3. The "serendipity" theory is the first of the *Wadleigh* plaintiffs' two liability theories mentioned above. Basically, the plaintiffs contended that if the defendants had properly screened blood for Hepatitis B and other viruses, they would have screened out much of the blood contaminated with HIV. *Rhone–Poulenc* at 1301.

The Seventh Circuit's third concern related the district court's selection of certain issues for class certification. *Id.* at 1302. The court reasoned that the issues of proximate cause and comparative negligence are inseparable from the defendants' negligence. *Id.* at 1303. As a result multiple juries would be considering the issue of the defendants' negligence in violation of the Seventh Amendment and *Gasoline Products v. Champlin Refining Co.,* 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). Judge Poser wrote that issues may be separated out for class consideration, but "the district judge must carve at the joint." *Rhone–Poulenc* at 1302.

Finally, the majority decision closed with recognition that both the Fifth and Third Circuits had approved approaches similar to Judge Grady's. *Id.* at 1304 *citing Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468 (5th Cir.1986) and *In re School Asbestos Litigation,* 789 F.2d 996 (3d Cir.1986), *cert. denied,* 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986). Nonetheless, Judge Posner closed by saying that the approaches taken by those courts were both unique to asbestos and the subject of much criticism. *Rhone–Poulenc* at 1304. Judge Posner's opinion closed with the conclusion that there were better alternatives which "make[ ] more sense than entrusting the fate of an industry to a single jury." *Id.*

Judge Rovener wrote a vigorous dissent, much of which questioned the appropriateness of a writ of mandamus for an issue such as class certification. *Id.* at 1305. The dissent also criticized Judge Posner's prognostication that each of the plaintiffs would be awarded a seven figure judgment and his consideration of the merits of the plaintiffs' claims. *Id.* at 1308. Judge Rovener went on to say that the majority's concern about submitting class issues to a single jury "is a rationale for amending the rule, not for avoiding its application in a specific case." *Id.* Judge Rovener closed by admitting that he also had concerns about Judge Grady's trial plan but that "it should be given the

opportunity to succeed" and that the trial court has the power to modify or abandon its plan if it becomes unworkable at trial. *Id.* at 1308.

**B. The Applicability of the *Rhone–Poulenc* decision**

This Court shares Judge Rovener's misgivings about Judge Posner's decision. Moreover, the *Rhone–Poulenc* decision contains a number of legal and logical inconsistencies that lessen its weight in this Court. For the reasons discussed below, the Court finds the *Wadleigh* case factually distinguishable from this case. The Court declines Copley's invitation to follow the Seventh Circuit's application of economic justice to the Federal Rules of Civil Procedure.

■ The first concern expressed by Judge Posner was the placement of the fate of an entire industry in the hands of a single jury and the apparent lack of merit of the plaintiffs' claims. *Id.* at 1299. First of all, as this Court observed last October, consideration of the merits of the plaintiffs' claims is expressly prohibited when deciding whether to certify a class. *In re Copley,* 158 F.R.D. at 489 *citing Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Second, Judge Posner's apprehension that a single jury "will hold the fate of an industry in the palm of its hand" simply is not a legal basis to deny class certification.[4] Such economic reasoning may carry substantial weight in the Seventh Circuit, but this Court must look to Fed.R.Civ.P. 23 and its interpretation by courts to determine the appropriateness of class certification. In any event, in this case a single jury will determine the "fate" of a single company not an entire industry.

The second concern expressed in *Rhone–Poulenc* is the district court's manageability of the laws of various jurisdictions, especially in light of the plaintiffs' novel "serendipity" theory of liability. *Rhone–Poulenc* at 1300. This Court notes that even Judge Posner conceded "that at some level of generality the law of negligence is one, not only nation-

---

4. This reasoning also shows a profound mistrust in the jury system. If the defendants have indeed been successful in twelve of thirteen trials, one

should have faith that a class jury can also make a fair determination.

wide but worldwide." *Id.* at 1300. Certainly difficulties will be encountered in trying to condense the negligence standards of different jurisdictions, but classes based on such standards have been certified before. *E.g. In re Asbestos School Litigation,* 104 F.R.D. 422 (1984). Most significantly, the plaintiffs in this case do not propose any novel theories of liability, and as will discussed below, many traditional strict liability and negligence defenses may be irrelevant in this case.

The Seventh Circuit's third "concern" is no more persuasive to this Court. Judge Posner reasoned that the class issue of the defendants' negligence was inseparable from the issues of proximate cause and comparative negligence. *Rhone–Poulenc* at 1303. Unlike the *Wadleigh* case where some of the plaintiffs allegedly continued using blood products after the HIV danger was known, comparative negligence is unlikely to be a defense in this case. Unless a particular plaintiff used contaminated Albuterol after the recall, it is difficult to see how an individual plaintiff could be comparatively negligent by her use of Albuterol. Furthermore, Judge Posner's analysis effectively eviscerates Fed.R.Civ.P. 23(c)(4)(A). As this Court noted last October, the advisory note to that rule suggests the same separation of liability and injury issues proposed by the Court. *In re Copley,* 158 F.R.D. at 491, n. 1, *citing* Official Comment to Fed.R.Civ.Pro. 23(c)(4)(A).[5]

As Judge Rovener's dissent argued, the majority's concerns are focused more on the soundness of Fed.R.Civ.P. 23(c)(4)(A) than on its application in *Wadleigh. Rhone–Poulenc* at 1307. Unlike Judge Posner, this Court finds Fed.R.Civ.P. 23(c)(4)(A) a highly efficient way to preserve both judicial economy and the rights of the parties in the case. Judge Posner directs that, when separating out common issues, district courts must "carve at the joint." *Id.* at 1302. However, the effect of his decision takes away one of the sharpest instruments available to trial courts managing mass tort litigation.

Finally, this Court observes than many of the economic factors that seem to be the real driving force behind the *Rhone–Poulenc* decision are not present here. This case does not involve an entire industry and a wide range of products, but a single company and single product. This case does not involve novel theories of hindsight liability, but instead concerns a defendant who has admitted that some of its product was contaminated and that it is liable for any resulting injuries. Furthermore, even in October the Court noted that this case is not complicated by the foreseeability and professional standard of care issues present in *Wadleigh. In re Copley,* 158 F.R.D. at 492. Simply put, this Court in unpersuaded by the decision in *Rhone–Poulenc.* On the contrary, seven months after its initial certification, the Court is even more convinced of its class certification of the common factual issues of liability.

## C. Defendant's Copley's Arguments in Favor of Decertification

Even though Copley bases much of its motion to decertify on the *Rhone–Poulenc* decision, Copley's contentions go beyond that case. Therefore, the Court will address Copley's arguments regarding the constitutionality and manageability of the class certified below.

### 1. Constitutional Concerns

#### a. Generic Causation

■ Under the Court's trial plan detailed below, there will be two phases: (1) a trial of

---

5. That comment states, "This provision recognizes that an action may be maintained as a class action as to particular issues only. For example, in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; members of the class may thereafter be required to come in individually and prove the amounts of their respective claims." Under the Court's similar proposal, the class trial would establish Copley's liability to the class certified by the Court, which includes "all persons who suffered damages as a result of inhalation of Albuterol manufactured, supplied, distributed or placed in commerce by Copley Pharmaceutical, Inc." Under the Court's trial plan, if the Plaintiffs are successful at the class trial, Plaintiffs would essentially be proving their membership in the class by a showing of individual causation.

common underlying factual issues to determine Copley's liability, if any, to the class, and (2) separate trials in the transferor districts where Plaintiffs will have to prove, through a showing of individual causation, that they are in fact members of the class as defined by the Court.[6]

Through this approach the Court recognizes that there are common issues concerning the extent, nature and dangerousness of the contamination in Copley's Albuterol. Even Copley's proposed trial plan admits this much. Defendant's Proposed Trial Plan, pp. 5–6. For example, a threshold common issue that will have to be proved by every Plaintiff is whether the contaminants in Albuterol are harmful to the human body. Defendant contends that it would be unconstitutional for one jury to consider whether its Albuterol can injure a user and a second jury to consider whether a particular Plaintiff was in fact so injured. The main authorities cited by Copley for this proposition are *Rhone–Poulenc* and *Gasoline Products*, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). In *Gasoline Products*, the Supreme Court held that under the Seventh Amendment, a second jury can consider an issue related to a prior jury's verdict only if it "is so distinct and separable from the others that a trial of it alone may be had without injustice." 283 U.S. at 500, 51 S.Ct. at 515. Therefore, the Court examines whether the general issues of causation are "distinct and separable" from the issues of individual causation.

At the outset, the Court observes that *Gasoline Products* predates the Federal Rules of Civil Procedure. Thus, one can conclude that the comments from the Fed. R.Civ.P. 23(c)(4)(A) and the Manual for Complex Litigation endorsing the separate treatment of liability issues considered the requirements of *Gasoline Products*.[7] The

Court also recognizes that there are numerous cases where courts have separated out general issues of causation and liability from individual issues of injury and damages. These cases suggest that the Seventh Circuit's approach to Fed.R.Civ.P. 23(c)(4)(A) is the exception rather than the rule.

Perhaps the case most factually similar to the Court's trial plan is *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188 (6th Cir.1988). In *Sterling* the plaintiffs brought a class action against a single defendant claiming that their land had been contaminated by toxins which had migrated from the defendant's landfill. *Id.* at 1193. The district court certified the class and held a bench trial on the claims of representative class members. *Id.* at 1194. Under the trial court's plan, it deferred individual issues of causation and injury of other class members for later hearings. *Id.* at 1194. After the district court held the defendant liable and awarded individual damages to the representative plaintiffs and punitive damages to the class, defendant Velsicol appealed. *Id.* Among Velsicol's arguments on appeal were its contentions that common issues did not exist to justify class certification. *Id.* at 1196.

The Sixth Circuit observed that district courts enjoy broad discretion in certifying a class and that their plans should not be overturned absent an abuse of discretion. *Id.* at 1197. The Sixth Circuit then affirmed the district court's approach, reasoning,

> where the defendant's liability can be determined on a class-wide basis because the cause of the disaster was a single course of conduct which is incidental to each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.

---

6. Although the Court and the parties have referred to separate issues of generic cause and proximate cause, a more accurate description of the division of liability envisioned by the Court is "general causation", that is the ability to cause harm, and "individual causation", the harm, if any, to a particular plaintiff.

7. The Manual For Complex Litigation, 2d, advises, "The provision authorizing a class for specific "issues" does not require that an entire claim by or against a class be certified. Several courts

have assumed that class action treatment might be afforded one or more issues relating to liability, while denying (or deferring consideration of) class certification of other issues affecting liability or questions of damages." MCL 2d § 30.17. At a footnote to this provision, the Manual suggests that the separation of common liability issues from individual issues "appears to have been the intention of the drafters of [Fed.R.Civ.P. 23(c)(4)(A)]." *Id.* at n. 39.

In the instant case, each class member lived in the vicinity of the landfill and allegedly suffered damages as a result of ingesting or otherwise using contaminated water. Almost identical evidence would be required to establish the level and duration of chemical contamination, the causal connection, if any, between the plaintiffs' consumption of the contaminated water and the type of injuries allegedly suffered, and the defendant's liability. The single major issue distinguishing the class members is the nature and amount of damages, if any, that each sustained. To this extent, a class action in the instant case avoided duplication of judicial effort and prevented separate action from reaching inconsistent results with similar, if not identical, facts. The district court clearly did not abuse its discretion in certifying this action as a Rule 23(b)(3) class action. However, individual members of the class still will be required to submit evidence concerning their particularized damage claims in subsequent proceedings.

*Id.* at 1197. While this case involved a bench trial, this Court finds it significant that the Sixth Circuit did not even consider whether separate proceedings on general causation, individual causation, damages and injuries were constitutionally suspect.

A court that did consider, and reject, a constitutional challenge to a class certification like the one in the instant case was the Ninth Circuit in *Arthur Young & Co., et al. v. United States District Court,* 549 F.2d 686 (9th Cir.1977), *cert. denied,* 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977). In an action based on securities fraud, a district court certified a class for general liability but separated out individual issues including reliance, causation, laches, waiver, estoppel and ratification. *Id.* at 690.[8] Defendants sought a writ of mandamus arguing, in part, that the district court's separation of class and individual issues violated the Seventh Amend-

ment and the Supreme Court's decision in *Gasoline Products. Id.* at 692–693. The Ninth Circuit rejected that argument and concluded that *Gasoline Products* protected the substance and not the form of the right to a jury trial. *Id.* at 693. The court concluded, "[a]ssuming the first trial is heard and the class issues determined by one jury, as had been requested by the defendants, we perceive no absolute bar, constitutional or otherwise, to resolution of any remaining issues before either the same or a second jury." *Id.* (footnote omitted).

This Court observes that since the decision in *Arthur Young & Co.,* there has been no intervening Supreme Court decisions or changes in the Federal Rules of Civil Procedure that could explain the Seventh Circuit's decision in *Rhone–Poulenc.* On the contrary, since the Ninth Circuit's decision in *Arthur Young & Co.,* several other circuits have endorsed the separate treatment of class and individual issues. For example in *In re School Asbestos Litigation,* 789 F.2d 996 (3d Cir.1986), *cert. denied,* 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986), Judge Weis upheld a district court's certification of common issues of liability for a Rule 23(b)(3) class.[9] *Id.* at 1010. Judge Weis reasoned that, "[d]etermination of liability issues in one suit may represent a substantial savings in time and resources." *Id.* at 1008. He also observed,

> [r]eassessment in the utility of the class action in the mass tort area has come about, no doubt, because courts have realized that such an action need not resolve all the issues of litigation. See Fed. R.Civ.P. 23(c)(4)(A). If economies can be achieved by use of the class device, then its application must be given serious and sympathetic consideration.

*Id.* at 1008–1009. Finally, Judge Weis endorsed the trial court's view that common factual issues involving the health hazards of

---

8. At oral argument Copley's counsel tried to distinguish this case because it was premised on federal law, not state law. The nature of the cause of action is irrelevant to the consideration of the constitutionality of class certification for particular issues.

9. During oral argument Copley's counsel argued that many of the cases involving asbestos were distinguishable because they involve property damage, not personal injury. While that may be true, the elements and standard of proof do not differ for torts involving property and personal injury. Therefore, this distinction is irrelevant.

asbestos, "would not vary widely from one class member to another." *Id.* at 1009. As a result, class treatment of those issues was appropriate. *Id.*

In *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, *reh'g denied,* 785 F.2d 1034 (5th Cir.1986), the Fifth Circuit affirmed the trial court's decision to try common issues of liability followed by "mini-trials" representing the claims of individual plaintiffs. *Id.* at 472–472. The court stated, "necessity moves us to change and invent. Both the *[In re] Agent Orange [Product Liability Litigation,* 506 F.Supp. 762 (E.D.N.Y.1980)]* and the *Asbestos School* courts found that specific issues could be decided in a class 'mass tort' action—even on a nationwide basis. We approve of the district court's decision in finding that this 'mass tort' class could be certified." *Id.* at 473.

The Fourth Circuit took a similar approach in a case against the insurer of the manufacturer of the Dalkon Shield. *See In re A.H. Robins Co., Inc.,* 880 F.2d 709 (4th Cir.1989), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989).[10] After what may be the most comprehensive review of the law of class actions to be found in the *Federal Reporter,* the Fourth Circuit made several observations. Among these observations are that "the 'trend' is once again to give Rule 23 a liberal rather than restrictive construction" and "in order to promote the use of the class device and to reduce the range of disputed issues, courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case." *Id.* at 740. After the broad endorsement of the innovative use of Rule 23, and after noting the "uniqueness" of the Dalkon Shield case, the court went on to affirm the district court's certification of a Rule 23(b)(1)(B) and (c)(4) class. *Id.* at 740–741.

Apparently finding that *Dalkon Shield* was not so unique after all, the Fourth Circuit took a similar approach four years later in *Central Wesleyan College v. W.R. Grace & Co.,* 6 F.3d 177 (4th Cir.1993). In that case the court affirmed a district court's certification of a class under Fed.R.Civ.P. 23(c)(4)(A) for issues common to a class of colleges and universities seeking damages from asbestos manufacturers. *Id.* at 190. In fact, the court praised the district court's identification of common liability issues, stating, "[s]ignificant economies may be achieved by relieving educational institutions of the need to prove over and over when defendants knew or should have known of asbestos' hazards, or whether defendants engaged· in concerted efforts to conceal this knowledge." *Id.* at 185.

Thus, between 1977 and 1993, the Third, Fourth, Fifth, Sixth and Ninth Circuits have all used class certification for common issues of liability as a step forward in managing "mass torts." Significantly, none of those courts held that such an approach had any constitutional infirmities whatsoever. This Court chooses to join those courts in their progressive treatment of mass torts and disagrees with the Seventh Circuit's decision to take a massive leap back to the time before Rule 23 class actions. The weight of the current law demonstrates that the Seventh Amendment is not violated by the separation of common issues of liability for class treatment.

The Court's trial plan detailed below offers two phases of litigation that each involve "distinct and separable" issues and, as a result, the Seventh Amendment is preserved. *Gasoline Products,* 283 U.S. at 500, 51 S.Ct. at 515.

### b. Application of Different State's Laws

■ The heart of Copley's arguments concerning the application of laws from different jurisdictions comes in its argument that the class is unmanageable. However, Copley also contends that consideration of different standards of liability violates the Constitution. Despite *Rhone–Poulenc's* holding that Judge Grady's approach would be unconstitu-

---

10. At oral argument defense counsel tried to distinguish this case because the defendant was not a products liability manufacturer but an insurance company. Considering that the action charged that Aetna Casualty and Surety was a joint tortfeasor for the manufacture of the Dalkon Shield, this Court finds little reason to disregard its precedent. *See In re A.H. Robins Co., Inc.,* 880 F.2d at 710.

tional, in many of the cases discussed above the courts approved nationwide classes and did not find that the difference in state laws made such an approach unconstitutional. *E.g. In re Asbestos School Litigation,* 104 F.R.D. 422, 434 (E.D.Pa.1984), *modified,* 789 F.2d 996 (3d Cir.1986), *cert. denied,* 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986), (holding that "substantial duplication" of negligence and strict liability laws in fifty-one jurisdictions make nationwide class manageable). For example, when presented with a nationwide class in *In re School Asbestos Litigation,* the Third Circuit did not even consider—much less agree with—an argument that the district court's approach was unconstitutional. *In re School Asbestos Litigation,* 789 F.2d at 1010. Confident that the Seventh Circuit may be out of step with its sister circuits, this Court will turn to Copley's primary argument about differing state laws: that they make the class unmanageable.

*2. Manageability of the Class*

Copley raises a very real concern that the laws of the different state jurisdictions make a trial unmanageable.[11] In addition to the *Rhone–Poulenc* decision, Copley contends that states' differing approaches to products liability makes the certification of a nationwide class unmanageable. *See generally,* William C. Powers, *The Persistence of Fault in Products Liability,* 61 TEX.L.REV. 777, 779–881 (1983).

For their part, the Plaintiffs give numerous examples of courts who were undeterred by the specter of differing standards of negligence and product liability. Most notable among these was *In re Asbestos School Litigation,* where Judge Kelly observed that "51 jurisdictions are in virtual agreement in that they apply the Restatement (Second) of Torts § 388" and "forty seven jurisdictions have adopted strict liability and all of them start with the concept of a defective product." 104 F.R.D. at 434. *See also, In re Lilco Securities Litigation,* 111 F.R.D. 663, 670 (E.D.N.Y.1986) (application of law of all

fifty states does not make class "per se unmanageable"); and *In re Cordis Corporation Pacemaker Product Liability Litigation,* MDL No. 850 (S.D.Ohio, Dec. 23, 1992) (Slip. Op. at 35) (concluding that even though the source of liability laws may differ, the substance of these laws does not vary greatly).

■ This differing authority leads the Court to conclude that the decision whether to attempt to manage a class under differing laws is committed to the discretion of the trial court. *See Reed v. Bowen,* 849 F.2d 1307 (10th Cir.1988) (class certification committed to the discretion of trial court).

■ Furthermore, several factors make this class an excellent candidate for the application of law to a nationwide class. First, this case involves only one defendant manufacturer, Copley Pharmaceutical, and, at the present time, only one product, Albuterol 0.5%. Second, the product in question is safely manufactured by many other generic drug companies. Third, Copley, through its counsel, has admitted that at least some of its Albuterol was contaminated and that it is liable for any injuries such contamination may have caused.

Because of these facts, many of the "nuances" in state negligence and products liability laws may be irrelevant in this case. For example, comparative negligence, a defense that varies throughout the states, will only be relevant in the rare cases where a plaintiff used Albuterol after the recall. Similarly, the traditional strict liability defenses of risk/utility, state of the art and assumption of the risk are irrelevant because Copley has admitted that it is liable for any injuries caused by its Albuterol. As detailed in the Court's trial plan below, if an individual state's law is at variance with the general law on a relevant point of law, its residents may be removed from the class. Therefore, the Court is not intimidated by the parade of horribles presented by the Defendant.

Finally, Copley's counsel repeatedly argued that there was not a single case where

---

11. Currently the Court has sixty-six cases transferred to it from twenty-three different jurisdictions. However, under the Court's class definition there may be class members from up to fifty-

two jurisdiction (counting the District of Columbia and Puerto Rico) depending on whether the non-diverse plaintiffs from Massachusetts are included.

a trial was held in a mass tort case which applied the laws of all fifty states. But the absence of an example does not prove that such classes are per se unmanageable. The fact is that most class actions settle and few go to trial whether the class is nationwide or statewide. This Court might indeed be the first to take such a class action to trial, but based on the policy reasons discussed below, the Court is ready to take on that challenge.

### 3. Policy Reasons Supporting a Class Action

In its Order Granting Partial Class Certification, this Court stated that the most convincing reason for certification was not offered by Plaintiffs' lead counsel, but by a single attorney in less than a minute. *In re Copley,* 158 F.R.D. at 492. During oral arguments concerning class certification, one attorney approached the Court from the back of the courtroom. He succinctly stated that he had six clients, none of whom had large claims against Copley. He said that without class certification his clients would essentially lose their claims because neither he nor his clients had the resources to sue a large defendant like Copley. *Id.*

Seven months later, after hearing the arguments on decertification, the compelling argument made by this attorney still rings true in the Court's ears. Plaintiffs' counsel repeated this point when they suggested that the real motivation behind Copley's motion to decertify was to cripple the claims brought by individual plaintiffs with less experienced counsel. Copley may or may not have such a goal, but the Court agrees that if the class is decertified, the courthouse door could be slammed on a great many plaintiffs.

Given Judge Posner's recent decision in *Rhone–Poulenc,* it is ironic that over fifty years ago, it was the Seventh Circuit which recognized,

> to permit the defendant to contest liability with each claimant in a single separate suit would, in many cases, give defendants an advantage which would almost be equivalent to closing the door of justice to small claimants. This is what we think the class suit practice was to prevent.

*Weeks v. Bareco Oil Co.,* 125 F.2d 84, 90 (7th Cir.1941).

Today, in the era of "mass torts" many commentators agree that class actions are necessary to protect the interests of individual plaintiffs. One such commentator has observed,

> The case by case mode of adjudication magnifies this burden [of litigating complex issues] by requiring the parties and courts to reinvent the wheel for each claim. The merits of each case are determined de novo even though the major liability issues are common to every claim arising from the mass tort accident, even though they may have been previously determined several times by full and fair trials. These costs exclude many mass tort victims from the system and sharply reduce the recovery for those who gain access. Win or lose, the system's private law process exacts a punishing surcharge from defendant firms as well as plaintiffs.
>
> . . . . .
>
> In addition, the case-by-case, individualized processing of the mass tort claims that are filed confers a strategic edge upon defendant firms. While it prevents victims from deriving the benefits of a concerted action, the traditional process has no similar effect on the capacity of the defendant firms to spread litigation costs and prepare the common questions efficiently for a once-and-for-all basis.

David Rosenberg, *Class Actions for Mass Torts: Doing Individual Justice by Collective Means,* 62 Ind.L.J. 561, 563–564, 570–571 (1987) (footnotes omitted). The author has also recognized,

> Class treatment, moreover, has been extended solely to common questions of law and fact concerning liability, preserving the right to an individual trial on damages. In some cases courts have gone slightly beyond the conventional bifurcation of liability and damage elements of the tort cause of action. They have instead designated certain common liability issues for class treatment, while remanding the remaining liability questions related to the circumstances of each member to an indi-

vidual trial before, or along with, determination of damages.

*Id.* at 568–569. (Footnotes omitted).

Numerous other commentators have recognized the benefit of class certification for common issues of liability. *E.g.* Wright & Miller, *Federal Practice and Procedure:* Civil 2d § 1783, p. 76. Some practitioners have also observed the value of use of class actions to conserve the resources of plaintiffs, defendants and the courts. *E.g.* Marc Z. Edell, *Resolution of Mass Tort Litigation: A Practitioner's Guide to Existing Methods and Emerging Trends,* C949 ALI–ABA 37 (1994) *and* Sheila Birnbaum, *Case Management of Mass Tort Litigation,* 406 PLI/Lit 27 (1991).

Finally, Copley directs the Court to the infamous Advisory Committee Note to Fed. R.Civ.Pro. 23. That advisory note, a favorite among class action defendants, states, "A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for class action." However, this note was written nearly thirty years ago, before the advent of most "mass tort" litigation. As the Plaintiffs point out, even one of the authors of that note has repudiated it:

> I was an ex-officio member of the Advisory Committee on Civil Rules when Rule 23 was amended, which came out with an Advisory Committee Note saying mass torts are inappropriate for class certification. I thought then that was true. Unless we can use the class action and devices built on the class action, our judicial system is simply not going to be able to cope with the challenge of the mass repetitive wrong that we see in this case and so many others that have been mentioned this morning and afternoon.

H. Newberg, *Newburg on Class Actions,* § 17.06 (3d Ed.1992) quoting Professor Charles Allen Wright, *In re School Asbestos Litigation,* Master File 830268 (E.D.Pa.) Class Action Argument, July 30, 1984, Tr. 106. In the world of practice, it is now generally accepted that the committee's note is outdated. See, Pamela Coyle, *When Bigger Isn't Better,* AMERICAN BAR ASSOCIATION JOURNAL, March 1995, at 72.

After many months of discovery, the able litigators on both sides of this case are well-versed in Copley's Albuterol and its contamination. Just as Copley will have the best counsel available, the Plaintiffs deserve to have counsel who are familiar with Albuterol, its manufacture and its contamination. In this way the truth about the common issues liability may be decided in one class trial. The Court's October 28, 1994 Order Granting Partial Class Certification stands and the Defendant's Motion to Decertify the Class is **DENIED.**

## II. The Court's Trial Plan

### A. Punitive Damages

■ : Both parties have submitted excellent briefs on the point of the alleged punitive conduct of Copley and whether the Court should try such conduct at the class trial. However, the Court is persuaded by Copley's two threshold arguments that the issue of punitive conduct cannot be added to the class issues to be tried in June. First and foremost, the notice to the class did not inform its members that punitive conduct would be tried. Therefore, it would be manifestly unjust to bind the class to the outcome of punitive issues without giving class members an opportunity to opt-out from the class. *In re Nissan Motor Corp. Antitrust Litigation,* 552 F.2d 1088, 1104 (5th Cir.1977) (due process requires adequate description of proceedings in notice given to members of a Rule 23(b)(3) class).

Secondly, in its October Order, the Court observed that punitive damages were inappropriate for class certification because they depend on an individual's injury and compensable damages. *In re Copley,* 158 F.R.D. at 492. Plaintiffs have since suggested that punitive conduct, that is whether Copley was willful and wanton or reckless, could at least be determined on a classwide basis. As attractive as this proposition is, punitive damages are measured, in part, by how outrageous such punitive conduct is relative to a particular plaintiff. *TXO Production Corp. v. Alliance Resources Corp.,* — U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). Therefore, it is necessary for the jury which is to determine the amount of punitive damages, if any, to consider how outrageous a

particular defendant's conduct may be. The Court concludes, as it did in October, that punitive damages and punitive conduct should be determined on an individual basis.

## B. Bellwether Plaintiffs

 At the status conference on March 17, 1995, the Court raised the possibility of adding the cases of bellwether plaintiffs at the class trial in June. At that hearing both parties agreed to explore such a possibility in their trial plans. While the Plaintiffs have submitted a proposal for the use of bellwether plaintiffs and nominated possible candidates, Copley has objected to such an approach. The Court decides against the use of bellwether plaintiffs for three reasons. First, at this late stage in the litigation the Court believes that it would be unfair to change, without Copley's consent, the identity of the individuals whose cases will be tried in June. Second, even though the Plaintiffs claim that Copley has adequately discovered the cases of the proposed bellwether plaintiffs, Copley insists such discovery is not complete. The Court will give Copley the benefit of the doubt on this issue. Third, the Court may replace named representative plaintiffs at any time. *Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, *reh'g denied*, 712 F.2d 1416 (5th Cir.1983). However, the Court must have a sufficient reason to name new class representatives and no concrete reasons have been given to the Court that would justify changing the parties to this case less than two months before trial. The case will proceed with the named representatives that the Court approved last October.

## C. Generic Causation

Again, Copley has admitted that four batches of its Albuterol were contaminated and that it is liable for any injury resulting from that contamination. Copley's posture throughout this litigation has been that none of the contaminants present in its Albuterol are capable of causing injury in human beings. Thus, it is ironic that Copley itself has created the best argument for general causation. Copley has presented the Court with a defense of lack of general causation.

As discussed above, the Court concludes that a jury may constitutionally consider some issues of general causation that focus on the extent and nature of the contamination in the Defendant's Albuterol. Based on these factual findings, a jury may determine whether the contaminants proved to be in Copley's Albuterol can be harmful to human beings.

## D. Issues to be tried

The trial plan proposed by the Court is subject to modification at the final pretrial conference which is currently scheduled for May 30, 1995. The Court proposes a two-phase trial plan:

### 1. Class Trial

#### a. Class Representatives' Claims

The Court begins with the simplest factor: all claims for relief made by the seven class representatives in the Amended Master Class Action Complaint will be tried under the choice of law rules of the State of Ohio. Furthermore, the jury will hear evidence of both compensatory and punitive damages for each of the class representatives. The goal of this trial will be to determine if Copley is indeed liable to the class as defined by the Court.

#### b. Common Factual Issues

In addition to deciding the individual cases of the class representatives, the jury will consider the following factual issues:

(1) To what extent was Copley's Albuterol contaminated?

(a) What batches were contaminated?

(b) What were the contaminants present?

(2) Using the class representatives as models, are those contaminants capable of causing damage to the human body?

(3) Was Copley's Albuterol defective?

(a) Was Copley's Albuterol defective in its design or manufacture?

(b) Did the contamination in Copley's Albuterol make it an "unreasonably dangerous" product?

(4) Was the defendant negligent in allowing the contaminants into its product?

(5) Did the defendant violate the Food, Drug & Cosmetic Act or the regulations promulgated thereunder?

(6) Did Copley breach express or implied warranties by its sale of contaminated Albuterol?

During the course of the trial, the Court will also consider evidence relevant to the Plaintiffs' request for the equitable remedy of medical monitoring. Such evidence should not only relate to the need for such monitoring, but also the scope and duration of a monitoring program. However, because of the equitable nature of medical monitoring, this issue should not be submitted to the jury.

The answer to the above questions will be binding on Copley and those who can carry their burden of proof in Phase II of the trial plan.

During this class trial, the Court will consider the relevant law of negligence, breach of warranty and strict product liability from all necessary jurisdictions. If the law of a particular state appears to be idiosyncratic, the residents from that state can be excised from the class. For example, if it is shown that the law of State of Idaho includes a relevant defense to product liability that conflicts with other jurisdictions, the Court will redefine the class to exclude Idaho residents. Even if such idiosyncrasies remove half the jurisdictions in the United States, which the Court believes is highly unlikely, the application of common issues concerning the other twenty-five states should conserve judicial and litigation resources for all involved.

The Court's approach may be simplified by various states' differing approaches to products liability. For example, in products liability actions, both North Carolina and Virginia apply theories of implied warranties rather than strict product liability. *Smith v. Fiber Controls Corp.*, 300 N.C. 669, 268 S.E.2d 504 (1980) and *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 374 S.E.2d 55 (1988). Conversely, Louisiana's Products Liability Act, which is based on a showing that a product is "unrea-sonably dangerous", is the exclusive remedy for injuries from products in that state. La. Rev.Stat. § 9:2800.51 *et seq.* Therefore, the jury's finding on implied warranty may be decisive in one state and irrelevant in another.

### 2. *Phase II: Individual Suits*

Following the trial on the class issues and the claims of the individual representative plaintiffs, if the Plaintiffs prevail in any significant way, the Court will thereupon return the cases to their transferor districts. .

Upon return, the transferor courts may then hold trials where plaintiffs will prove their membership in the class. Assuming the plaintiffs are successful at the class trial and Copley is found liable, individual plaintiffs will then have the burden of proving, under their local law, that they were in fact injured by the Defendant's product. Also at the trials, individual plaintiffs will present their claims for compensatory and punitive damages. While these trials will focus on issues of individual causation, plaintiffs will in fact be proving that they are members of the class because they, or those they represent, suffered damages because of Copley's Albuterol.

### *Conclusion*

After a thorough examination of the Seventh Circuit's decision in *Rhone–Poulenc* and Copley's constitutional arguments, the Court concludes that Copley's concerns are unfounded. While the Court's division of issues is somewhat innovative, it is believed to be based on legal precedent and promises to streamline the litigation in this case. The Court's proposed trial plan will resolve this case through two phases that balance the common issues of liability with the individual issues of causation, injury and damages.

Finally, the Court has carefully considered the suggestion that the Court continue the trial date until the fall to allow more time for counsel to review the evidence. There is more than six weeks between this date and the trial date which, given the large force of legal help available, should be adequate for the task of digesting the document discovery

and purging the video depositions of extraneous matters. Counsel on both sides are now immersed completely in the case and probably will never be more ready to try it. The Court has therefore concluded that it will let the trial date of June 12, 1995 stand.

Therefore, it is **ORDERED,** that the Defendant's Motion to Decertify the Class be, and the same hereby is, **DENIED;** It is further,

**ORDERED,** subject to modification at the final pretrial conference, the issues to be tried in this case are those outlined above.