CITY OF ST. PETERSBURG, a Florida municipality, et al., Plaintiffs,

v.

TOTAL CONTAINMENT, INC., a Pennsylvania corporation, et al., Defendants.

No. 06–20953–CIV.

United States District Court, S.D. Florida.

Feb. 10, 2010.

Robert T. Cunningham, Jr., Richard T. Dorman, Steven L. Nicholas, R. Edwin Lamberth, Bryan E. Comer, Cunningham, Bounds, Crowder, Brown & Breedlive, LLC, Mobile, AL, Ronald Joel K. Gregg, Capouano, Beckman, Russell & Gregg, Montgomery, AL, for Plaintiffs.

Frederick H.L. McClure, E. Colin Thompson, Matthew Meyer, Tampa, FL, Jeffrey D. Herschman, Anthony L. Meagher, DLA Piper Rudnick Gray Cary US LLP, Baltimore, MD, Canam Group, Inc., Canam Manac Group, Inc. & Canam Steel Corp.

Maritza Pena, Marlow, Connell, Valerius, Abrams, Adler, Newman, Lewis & Blevins, Coral Gables, FL, Paul D. Smolinsky, Jackson & Campbell, Washington, DC, for Commerce & Industry Insurance Company.

Dennis M. O'Hara, Jordan S. Cohen, Wicker, Smith, O'Hara, McCoy, Graham & Ford, PA, Fort Lauderdale, FL, Total Containment, Inc.

Lynda M. Hill, Miller & Martin, PLLC, Chattanooga, TN, T. Harold Pinkley, James Williams, Miller & Martin, PLLC, Nashville, TN, John Dannecker, Dario Perez, Shetts & Bowen, LLP, Nashville, TX, for Cleveland Tubing, Inc.

Frank Zacherl, Brad Redlien, Schutts & Bowen, LLP, Miami, FL, Joseph M. Goldstein, Edward J. O'Sheehan, Rachel H. LeBlanc, Shutts & Bowen, LLP, Fort Lauderdale, FL, for PolyFlow, Inc., TC Fuel Components, Inc. & Finloc US, Inc.

Richard B. Easton, II, E. Gregg Barrios, Ralph H. Wall, Mark J. Spansel, Charles A. Cerise, Jr., Adams & Reese, LLP, New Orleans, LA, Chris L. Evans, Adams & Reese, LLP, Houston, TX, Jannea S. Rogers, Adams & Reese, LLP, Mobile, AL, for Dayco Products, LLC, Mark IV Industries, Inc., Mark IV Industries, Ltd. & MIV Holdings, SA.

Deb Kuchler, Rick M. Simses, Abbott, Simses & Kuchler, APLC, Houston, TX, Paul M. Lavelle, Abbott, Simses & Kuchler, APLC, New Orleans, LA, for Dayco Products, Inc. and Dayco Products, LLC.

## ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (D.E.663) AND DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (D.E.441)

JOAN A. LENARD, District Judge.

**THIS CAUSE** is before the Court on the Report and Recommendation issued by U.S. Magistrate Judge Edwin G. Torres on November 30, 2008 ("Report," D.E. 663), recommending that the Motion for Class Certification filed by Plaintiffs on February 7, 2008 ("Motion," D.E. 441), be denied in its entirety. On December 15, 2008, Plaintiffs filed their Objections to the Report ("Objections," D.E. 666). On January 2, 2009, Defendants filed their Response to Plaintiffs' Objections ("Response to Plaintiffs' Objections," D.E. 671). Having reviewed the Motion, the relat-ed pleadings, and the record *de novo,* the Court finds as follows:

## I. Background

This case involves thermoplastic flexible piping ("FlexPipe"), marketed and distributed for use in underground fuel containment systems, to enable petroleum fuels to be pumped from underground storage tanks ("USTs") to above-ground fuel dispensers such as those used at gas stations. (Report, D.E. 663 at 1–2.) Plaintiffs—the City of St. Petersburg, Florida ("CSP"), Twin Oil Company ("Twin Oil"), and Jeff Montgomery Associates ("JMA")—claim Defendants designed, manufactured, marketed, distributed and sold to them FlexPipe that Defendants knew, or should have known, was fundamentally unsuitable for its intended use. (*Id.* at 2.) Defendants—Total Containment, Inc. ("TCI"), TC Fuel Components, LLC ("TC Fuel"), Dayco Products, Inc. and Dayco Products, LLC (collectively "Dayco"), Cleveland Tubing, Inc. ("CT"), Canam Group, Inc., Canam Manac Group, Inc., Canam Steel Corporation, (collectively "Canam"), Finloc, Inc. and Finloc US, Inc. (collectively "Finloc"), and Polyflow, Inc. ("Polyflow")—are alleged to have participated in the manufacture, distribution, marketing, and sale of defective FlexPipe in various capacities.[1]

According to Plaintiffs, Defendants also engaged in a scheme to market and sell defective FlexPipe for profit, knowing that the product was defective and not approved for sale by federal and state regulatory authorities. (*Id.*) As a result of Defendants' conduct, Plaintiffs purchased FlexPipe that has deteriorated or is deteriorating, and will result in environmental contamination and damage to Plaintiffs' FlexPipe and fuel containment systems. (*Id.*) Plaintiffs also seek compensation for business disruption losses as a result of defective FlexPipe. (*Id.* at 3.)

As the Report notes, the crux of Plaintiffs' claims is that the FlexPipe manufactured and sold by Defendants is inherently and uniformly defective. (*Id.*) Specifically, Plaintiffs

---

1. AIG Commercial Insurance Company of Canada ("AIG"), f/k/a Commerce & Industry Insurance Company of Canada, the underwriter of an insurance policy issued to TCI, joined the case as an Intervenor–Plaintiff on November 14, 2006. (*See* Order Granting Motion to Intervene, D.E. 193.)

allege a general defect with FlexPipe that allows petroleum fuel to permeate both the inner pipe barrier as well as the secondary containment pipe. (*Id.*) Plaintiffs allege that this "inside-out permeation causes the other layers to swell, delaminate, and become weaker, thereby rendering it susceptible to bursting, delaminating, and cracking under normal operation conditions. The outside-in permeation results in similar effects, through exposure and degradation." (Motion at 12 n. 7.) As a result, FlexPipe fails prematurely and leaks fuel. This general defect is a function of FlexPipe's inherent incompatibility with petroleum fuel, even under normal operating conditions. (*See* Report at 3; Motion at 13.) Plaintiffs allege that despite knowledge of the defective nature of Flex-Pipe, Defendants used promotional videos, brochures, and trained sales personnel to fraudulently market their product. (Motion at 15.) Plaintiffs also assert that the warranties provided by TCI, Dayco, and CT were inadequate and misleading to the extent they warranted FlexPipe's compatibility with fuel or that their products were free from material defects. (Motion at 16–17.)

As a result, Plaintiffs commenced the instant lawsuit on April 12, 2006. (*See* Class Action Complaint, D.E. 1). Plaintiffs subsequently filed their Second Amended Complaint on February 23, 2007, seeking damages for negligence (count I), strict products liability (count II), intentional fraudulent concealment (count III), fraud in the inducement (count IV), negligent misrepresentation/concealment (count V), breach of express warranty (count VI), and unjust enrichment (count VII). (*See* Second Amended Complaint ("SAC"), D.E. 211.) On February 7, 2008, Plaintiffs filed their Motion seeking to certify a class comprised of:

> All persons and entities in the State of Florida (a) who presently own thermoplastic flexible piping ("FlexPipe") (including but not limited to that sold under the brand names "Enviroflex," "Omniflex," and "Monoflex") or (b) who formerly owned FlexPipe located in the State of Florida, and incurred any expense associated with

> (1) repair or replacement of all or part of the FlexPipe, and/or (2) a fuel leak from the FlexPipe (the "Class").

(Motion at 2.) Plaintiffs' Motion was referred to the Magistrate Judge on February 8, 2008 (D.E.462). Defendants filed their response briefs (D.E.527, 528, 530, 540, 546) in opposition to class certification on March 7, 2008, and Plaintiffs filed their reply brief (D.E.568) on March 17, 2008. In addition, the parties filed numerous briefs supplementing the class certification motion. (*See* D.E. 608, 611, 612, 614, 615). The Magistrate Judge held oral argument on October 8, 2008 (see D.E. 631), and issued his Report on November 30, 2008 (D.E.663), recommending that class certification be denied. Plaintiffs filed their Objections on December 15, 2008 (D.E. 666)[2] and Defendants their Response on January 2, 2009 (D.E.671).

## II. Discussion

Prior to certifying a class action, district courts must conduct a "rigorous analysis" of whether a putative class meets the requirements of Rule 23 of the Federal Rules of Civil Procedure. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996). The Magistrate Judge's Report concludes that although Plaintiffs are able to satisfy the requirements for certification under Rule 23(a), they are unable to meet any of the prerequisites of Rule 23(b), and therefore class certification is inappropriate in this case. Because the Magistrate Judge determined Plaintiffs were unable to satisfy the prerequisites of Rule 23(b), the Magistrate Judge did not address arguments raised by CT that Plaintiffs' proposed class was overly broad, amorphous and vague. (*See* CT's Response in Opposition to Plaintiffs' Motion for Class Certification, D.E. 527, at 2–8.) Rather, the Report first looks to whether Plaintiffs meet the requirements for class certification under Rule 23(a).

### A. Rule 23(a)

The Report concludes that Plaintiffs' Motion meets the requirements of Rule 23(a)

---

**2.** Plaintiffs additionally filed a "Supplement to Plaintiffs' Objection to Report and Recommendation on Plaintiffs' Motion for Class Certification

and Renewed Request for Oral Argument" (D.E. 691).

and no parties object to this finding. Rule 23(a) lists the prerequisites to a class action and states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Parties seeking class certification bear the burden of establishing each element of Rule 23(a), commonly referred to as numerosity, commonality, typicality and adequacy of representation. *See Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir.2003); *Jones v. Jeld–Wen, Inc.*, 250 F.R.D. 685, 692 (S.D.Fla. 2008). Although the Magistrate Judge finds several of the Rule 23(a) requirements to be a closer call than others, the Report concludes Plaintiffs satisfy their burden under Rule 23(a). Because neither party objects to this finding and the Court finds that the Report's analysis is thorough and well-reasoned, the Court adopts the Report's finding that Plaintiffs satisfy the Rule 23(a) prerequisites.

"In addition to meeting the four requirements of Rule 23(a), parties seeking class certification must prove that the action is maintainable under one of the three subsections of Rule 23(b)." *Jeld–Wen*, 250 F.R.D. at 694 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). Plaintiffs contend their proposed class meets the requirements to certify a class under Rule 23(b)(3), or alternatively under Rule 23(c)(4) or 23(b)(1).

**B. Rule 23(b)(3)**

■ After conducting the Rule 23(a) analysis, the Magistrate Judge states that "[e]ven if our analysis of Rule 23(a) is arguable, we conclude that the Rule 23(b)(3) issue amounts

to a clear and convincing death knell to Plaintiffs' attempt to certify a class." (Report at 12.) In order to certify a class under Rule 23(b)(3), the court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3); *see Amchem Products*, 521 U.S. at 615, 117 S.Ct. 2231 ("To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.' "). These requirements are frequently referred to as "predominance" and "superiority." Because Plaintiffs object to the Report's analysis of the predominance and superiority prongs of Rule 23(b)(3), the Court conducts a *de novo* determination of whether Plaintiffs' proposed class satisfies these requirements.[3]

**1. Predominance**

■ In order to satisfy the predominance inquiry under Rule 23(b)(3), Plaintiffs need not demonstrate that every question of law or fact is common to the class. *See Jeld–Wen*, 250 F.R.D. at 694 ("Under Rule 23(b)(3) it is not necessary that all questions of law or fact be common, but only that some questions are common and that they predominate over the individual questions.") (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir.2004)). The predominance inquiry, however, is much more stringent than Rule 23(a)(2)'s requirement of commonality. *See id.; Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997). For the reasons set forth below, Plaintiffs fail to establish that common issues will predominate over individual ones in this case.

In concluding that individual issues predominate common questions of law or fact, the Report first notes that products liability

---

3. Pursuant to 28 U.S.C. § 636(b)(1), the Court is only required to make a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."

claims based on negligence and strict liability typically require a substantial amount of individualized proof in order to demonstrate proximate causation and damages. (Report at 17.) Responding to Plaintiffs' theory of general causation, the Report rejects the notion that strict liability and negligence claims could be subject to a clear-cut determination with generalized proof, and finds evidence that FlexPipe was generally defective would do nothing to resolve whether the defect did in fact cause any individual class member's harm. (*Id.* at 18.) In support, the Magistrate Judge notes that this case involves many different models of FlexPipe, manufactured and distributed by different Defendants, installed and maintained at different sites, over a number of years. (*Id.* at 19) The Report states:

> The representative Plaintiffs and the putative class members used different models of flexible piping manufactured by different companies at different times and at different locations that were installed in different locations under different circumstances.... Many changes in design and manufacture occurred over many years in the flexible piping sold to the named Plaintiffs and putative class members.

(*Id.* at 19–20.) The Report also finds that Plaintiffs' proposal of conducting trial in three phases would still require numerous "individualized determinations concerning liability and damages (including causation, damages, and affirmative defenses such as comparative fault)" as well as implicate "due process considerations concerning the amount of punitive damages to award." (*Id.* at 24.) As a result, the Report finds a lack of

predominance fatal to certification, to which Plaintiffs object.

Plaintiffs' objections to the Report's predominance analysis are as follows: (1) this case is distinguishable from *Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours and Co., Inc.,* No. 91–8709–CIV, 1994 WL 1251231 (S.D.Fla. Oct.30, 1994); (2) this case is distinguishable from the other cases cited by the Magistrate Judge; (3) the Magistrate Judge erred because instances of FlexPipe failure unrelated to the defect are not fatal to class certification; (4) individual damage determinations do not defeat class certification; (5) Plaintiffs' punitive damages approach is proper; (6) the Magistrate Judge failed to consider trifurcation; and (7) the Magistrate Judge failed to consider subclasses. (Objections at 10–19.) For the reasons set out below, the Court finds Plaintiffs' objections unpersuasive.

The Court finds that individual issues going to liability and damages predominate any common questions in this case. Despite Plaintiffs' repeated characterizations that this case involves a uniform defect that can be proven through common proof of causation, the record suggests otherwise. Highly individualized evidence will be required in order for Plaintiffs to satisfy the elements of each of their claims. In addition, while not a bar to certification, individual questions as to calculation of damages will require further individualized facts. The other tools proposed by the Plaintiffs, such as bifurcation, trifurcation, or subclasses do not address this fundamental shortcoming. As a result, the Court finds Plaintiffs fail to establish predominance.[4]

---

4. As a threshold matter, it is worth noting that class certification is often denied in mass tort cases because of problems with establishing class-wide causation. One treatise notes:

> Courts traditionally have been reluctant to certify class actions under Rule 23(b)(3) in mass tort cases because individual questions would predominate over common ones, due to the inherent nature of personal injury suits.... While acknowledging the possibility of using class actions in these mass tort cases, however, the Court also concluded that individual issues are particularly likely to predominate in cases involving long-term torts because members are likely to have suffered different types of inju-

ries at different times and through different causal mechanisms.

5–23 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.45(5)(d)(i) (3d ed.1999); *see also Dahlgreen's Nursery,* 1994 WL 1251231 at *9 (" '[P]roduct liability actions seldom are found to meet [the predominance] requisite because the individual character of the issues of causation and damages predominate over any common question.' ") (quoting JACK H. FRIEDENTHAL, MARY KAY KANE & ARTHUR R. MILLER, CIVIL PROCEDURE § 16.21 (2d ed.1993)). The Report correctly notes that many district courts have denied class certification in products liability cases because causation could not be established on a class-wide basis. (Report at 21) (citing *Sanneman v.*

Predominance is lacking and certification is inappropriate under Rule 23(b)(3) where the case does not lend itself to generalized proof tending to prove or disprove the elements of plaintiffs' claims. *See Dahlgren's Nursery,* 1994 WL 1251231 at *9 ("A question is deemed 'common' 'when there exists generalized evidence that proves or disproves the element on a simultaneous, class-wide basis. Such proof obviates the need to examine each class member's individual position. . . .' ") (internal citation omitted). Recognizing the inherent difficulty in certifying a class with so many individual variables, Plaintiffs have repeatedly characterized this case as involving a uniform defect that causes general harm. (*See* Motion at 17 ("This is a classic product defect case including warranty and fraudulent concealment claims based on a *uniform* defect and Defendants' *uniform* express warranty and *uniform* concealment of that defect.") (emphasis added).) Nevertheless, Plaintiffs bring causes of action that require demonstration of, *inter alia,* elements such as causation, misrepresentation and justifiable reliance for each individual claimant.[5] As explained below, each of Plaintiffs' claims contain elements where individual questions predominate.

### a. Negligence and Strict Liability

■ Plaintiffs' negligence and strict products liability claims (counts I and II of the SAC) require Plaintiffs to establish proxi-

mate cause exists for each class member. Under Florida law, the elements of a cause of action for negligence in a products liability case are the following: (1) the manufacturer must have a legal duty to design and manufacture a product reasonably safe for use; (2) the manufacturer must fail to comply with that duty; (3) the plaintiff must have an injury that is legally caused by the manufacturer's breach of duty; and (4) the plaintiff must have suffered damages. *Indem Ins. Co. of N. Am. v. Am. Aviation, Inc.,* 344 F.3d 1136, 1146 (11th Cir.2003) (per curiam). Thus, in order to prevail on their negligence claim, putative class members in this case would each need to show by a preponderance of evidence that their pipe failure, fuel containment system failure, soil contamination, and/or any other injury were legally caused by defective FlexPipe. *See also Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1295 (11th Cir.2005) ("To establish causation sufficient for a negligence claim in a products liability case, the plaintiff must prove by a preponderance of the evidence that his injury was proximately caused by the manufacturer's breach of its duty to produce a product reasonably safe for use.").

■ Similarly, the elements of a strict products liability claim under Florida law require plaintiffs to establish (1) a relationship between the defendant and the product; (2) a defect which caused the product to be unreasonably dangerous; and (3) causation

Chrysler Corp., 191 F.R.D. 441, 449 (E.D.Pa. 2000); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 F.R.D. 332, 347 (D.N.J. 1997); *In re Ford Motor Co. Vehicle Paint Litig.,* 182 F.R.D. 214, 220 (E.D.La.1998); *Frosini v. Bridgestone Firestone N. Am. Tire,* No. CV 05–0578 CAS (RZx), 2007 WL 2781656, at *15 (C.D.Calif.Aug. 24, 2007).) Plaintiffs object that "[t]his case is fundamentally distinct from the other cases the R & R relies upon." (*Id.* at 12–14.) Nonetheless, the cases are cited for the proposition that individual issues of causation often preclude predominance and the Report simply states "[w]e are bolstered in our decision by numerous other rulings in products liability cases like this one that causation usually cannot be determined on a class-wide basis." (Report at 21.)

5. Plaintiffs object that the Report's "predominance analysis gives a disproportionate amount of weight to the alleged problem of establishing

causation class-wide" and that "[b]y suggesting that individualized causation issues predominate over common issues, the R & R essentially engrafts a causation element into Plaintiffs' five other claims—breach of warranty, intentional fraudulent concealment, fraudulent inducement, negligent misrepresentation, and unjust enrichment." (Objections at 14.) Plaintiffs overlook the Report's finding that "[o]ther claims raised in this case will require even more individualized proof" and statement that "it cannot realistically be argued that Plaintiffs' fraud claims, laden as they are with highly individualized elements like detrimental reliance, are capable of being resolved on a class-wide basis. Indeed Plaintiffs' memoranda pay little attention to their fraud claims for that obvious reason." (Report at 21.) Rather than "engraft" causation into the elements of the rest of Plaintiffs' claims, the Magistrate Judge correctly notes that Plaintiffs' other claims would also require individualized proof so as to defeat predominance.

between the defect and the harm suffered by the user. *See West v. Caterpillar Tractor Co., Inc.*, 336 So.2d 80, 87 (Fla.1976) ("In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages."). As a result, each class member in this case must establish the existence of a proximate causal connection between the defect in FlexPipe and their injury. Proof that FlexPipe is generally defective would do nothing to prove that FlexPipe's defect proximately caused injury to each putative class member.

■ The Report illustrates this point by noting three instances where FlexPipe failed for reasons other than the alleged defect. (Report at 18–19.) The Report states:

> In 1998, Twin Oil reported a leak from Enviroflex hose at the North Miami Beach station. Plaintiffs have stated that the hose broke and they do not claim that the failure resulted from the defect at issue in this case. In 2002, Jeff Montgomery Associates reported a leak in flexible piping that was caused by a loose connection or loose fitting, not the alleged uniform defect. In addition, Defendants cite the discovery at a JMA site of a secondary containment hose that was breached and apparently patched with duct tape, then painted to hide the breach. The hoses cited in these three examples were not preserved so there is no way to know precisely why each failed.

(*Id.* (internal citations omitted).) Plaintiffs object that evidence "[t]hat in a handful of instances the FlexPipe may have broken or been attached incorrectly does not mean it does not *also* suffer from the defect." (Objections at 15 (emphasis in original).) Nevertheless, Plaintiffs' objection proves the point which it refutes. Defective FlexPipe could be only one of several potential causes of any class member's harm. The Court agrees that, "Plaintiffs cannot show that causation here is susceptible to generalized proof on a class-wide basis because determining wheth-

er there is a uniform defect in certain models of FlexPipe in no way resolves whether the defect did in fact cause any individual class member's harm." (Report at 18.) Thus, Plaintiffs' strict liability and negligence claims do not present common questions of law or fact that predominate individual issues.

### b. Fraud

■ Likewise, Plaintiffs' claims for intentional fraudulent concealment (count III), fraud in the inducement (count IV), and negligent misrepresentation/concealment (count V) all require putative class members to present individual proof that misstatements or misrepresentations were made to them and that they justifiably relied on those statements or omissions. In order to establish liability on their intentional fraudulent concealment and negligent misrepresentation claims, Plaintiffs must demonstrate (1) a misrepresentation of a material fact, (2) knowledge of the representor of the misrepresentation or absence of knowledge by the representor of the truth or falsity of the representation; (3) an intention that the representor induce another to act on it; and (4) resulting injury to the party acting in justifiable reliance on the representation. *See Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 264 F.Supp.2d 1064, 1073 (S.D.Fla.2003); *Coral Gables Distrib., Inc. v. Milich*, 992 So.2d 302, 303 (Fla.3d Dist.Ct. App.2008). Thus, in this case, putative class members would need to prove a misrepresentation was made to them and that they in turn relied upon that misrepresentation to their detriment.

While it is true that in this Circuit, "the simple fact that reliance is an element in a cause of action is not an absolute bar to class certification," *Klay*, 382 F.3d at 1258, this case is not one where class-wide reliance may be established by common evidence. *Klay* involved a putative class action brought on behalf of doctors who submitted claims for reimbursement to HMOs and were systematically underpaid. The Eleventh Circuit determined class certification was inappropriate for the majority of the plaintiffs' claims but held certification appropriate for the plaintiffs' RICO claims for two reasons. First,

the court found that common issues of fact concerning the existence of a national conspiracy, a pattern of racketeering activity, and a Managed Care Enterprise tended to "predominate over all but the most complex individualized issues." *Id.* at 1258–59. Second, the court found that "while each plaintiff must prove his own reliance in this case, we believe that, based on the nature of the misrepresentations at issue, the circumstantial evidence that can be used to show reliance is common to the whole class." *Id.* at 1259. This case does not involve common questions of fact so substantial that they predominate over all but the most complex individual questions. Furthermore, this case involves misstatements or misrepresentations far different from those in *Klay.* Regarding the nature of the misrepresentations involved in *Klay,* the Eleventh Circuit stated:

> The alleged misrepresentations in the instant case are simply that the defendants repeatedly claimed they would reimburse the plaintiffs for medically necessary services they provide to the defendants' insureds, and sent the plaintiffs various EOB forms claiming that they had actually paid the plaintiffs the proper amounts. While the EOB forms may raise substantial individualized issues of reliance, the antecedent representations about the defendants' reimbursement practices do not. It does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due.

*Id.* Thus, the court in *Klay* found that the nature of the claim made a finding of misrepresentation and reliance obvious enough to be inferred from common evidence.

█ This case does not involve such a basic misrepresentation. Plaintiffs claim that different Defendants are responsible for numerous misrepresentations made to class

members. Plaintiffs allege that all Defendants are liable for making misrepresentations that FlexPipe was safe and effective for its intended use, was not subject to permeation, chemical reaction, breakdown or leakage, and would safely and effectively transport petroleum fuels in USTs for a period of at least 10 years. (SAC at 42.) Plaintiffs also claim all Defendants are liable for concealing the existence of the defect, that Defendants had not conducted sufficient testing to ensure FlexPipe's suitability for underground transmission of fuels, and the fact that FlexPipe would not perform as warranted. (*Id.*) Plaintiffs allege similar misrepresentations, but only against a subsection of Defendants, in Counts III and IV of the Complaint. (*Id.* at 33–42.) Plaintiffs' allegations do not differentiate between misrepresentations made as to different models or products. The potential misrepresentations in this case comprise many different alleged untruths or omissions, concerning FlexPipe's longevity, comparisons with steel or fiberglass piping, FlexPipe's compatibility with petroleum fuels, etc. In addition, putative members might have relied on statements by certain Defendants but not on those of others.

In any event, generalized proof that certain Defendants made misrepresentations would do nothing to avoid the introduction of individual evidence as to what misrepresentations each putative class member may have been subject to or relied upon. As a result, like Plaintiffs' negligence and strict liability claims, generalized proof that misrepresentations were made would do nothing to satisfy reliance on those statements or omissions on a class-wide basis.[6]

**c. Breach of Express Warranty and Unjust Enrichment**

█ Finally, Plaintiffs' claims for breach of express warranty (count VI) and unjust

---

6. Like Plaintiffs' claims for intentional fraudulent concealment and negligent misrepresentation, Plaintiffs' claims for fraudulent inducement would also require individualized proof regarding those false statements made by Defendants and any reliance on the part of putative class members. *See Simon v. Celebration Co.,* 883 So.2d 826, 832 (Fla. 5th Dist.Ct.App.2004) (ex-

plaining that the essential elements for a fraudulent inducement claim are: (1) a false statement of material fact; (2) the maker knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment).

enrichment (count VII) also would require putative class members to present a substantial amount of individualized proof in order to establish the elements of their claims. In order to establish liability for a breach of express warranty claim, Plaintiffs need to establish both causation and damages. *See McCraney v. Ford Motor Co.*, 282 So.2d 878, 878 (Fla. 1st Dist. Ct.App.1973); (*see also* Report at 21 (stating that even if reliance was not required for a breach of express warranty claim "[e]ach putative class member would [still] have to show that he or she was injured as a result of the defendant's breach of warranty.") (citing *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 641–42 (S.D.Fla.2008)).) In this case, Defendants issued warranties of varying lengths during different times within the class period. (*See* Defendants Finloc US, Polyflow and TC Fuel's Memorandum in Opposition to Class Certification, D.E. 540 at 30 n. 18 (stating TCI issued two different two-year warranties for its FlexPipe between 1989–1992, a five-year warranty from 1992–1996, two different ten-year warranties during the period 1996–1997, and a separate ten-year warranty in July 2000 that was reissued in February 2002).) In order to succeed on their claims, putative class members would need to establish that they were injured in connection with the particular warranty they received.

Similarly, in order to establish liability for unjust enrichment, Plaintiffs would need to demonstrate (1) a benefit was conferred upon one of the Defendants by the plaintiff, (2) Defendant's appreciation of that benefit, and (3) Defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. (*See Greenberg*, 264 F.Supp.2d at 1072; *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla.2d Dist.Ct.App.2006)). Unjust enrichment claims rarely satisfy the predominance prong of Rule 23(b)(3). *See Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir.2009)

("common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts."). That is because a claim for unjust enrichment requires the court to assess whether the individual circumstances of each particular claim would result in inequity. In this case, Plaintiffs would each need to present evidence that they individually conferred a benefit upon one of the Defendants and that the circumstances surrounding that transaction would make it inequitable for that Defendant to fail to return the benefit to that Plaintiff. In sum, Plaintiffs' objections that the Magistrate Judge "engrafts" a causation element into all of Plaintiffs' claims is mistaken. Each of Plaintiffs' claims contain one or more elements necessary to establish liability which would require highly individualized proof on behalf of each of the putative class members.[7]

### d. Liability

Where initial determinations such as liability turn upon highly individualized facts, certification under Rule 23(b)(3) is inappropriate. *See Rutstein v. Avis Rent–A–Car Systems, Inc.*, 211 F.3d 1228, 1235–36 (11th Cir.2000) ("Serious drawbacks to the maintenance of a class action are presented where initial determinations, such as the issue of liability *vel non*, turn upon highly individualized facts.") (quoting *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C.Cir.1984)). As discussed above, Plaintiffs would need to present a substantial amount of individualized proof just to establish liability.

Moreover, contrary to Plaintiffs' Objections, the Court finds *Dahlgren's Nursery* instructive in this case. *Dahlgren's Nursery* involved a proposed class action lawsuit alleging negligence and strict liability claims against the manufacturer of contaminated "Benlate," a fungicide sold throughout Florida. The lawsuit alleged that Benlate destroyed or otherwise harmed plants upon application. 1994 WL 1251231 at *1. The

---

7. In determining whether common issues predominate individual ones, district courts should look at the "claims, defenses, relevant facts, and applicable law, to assess the degree to which resolution of the classwide issues will further each individual class member's claim." *Klay*,

382 F.3d at 1254 (internal citation omitted). Given the Court's findings regarding the individualized proof required by Plaintiffs' claims, the Court need not address how any defenses by Defendants might further present individual questions of fact or law.

plaintiffs in *Dahlgren's Nursery* argued that establishing with generalized proof that a class of Benlate users purchased Benlate during the relevant period and experienced damage to their plants, would allow a jury to infer Benlate was defective and caused harm to class members' plants. *Id.* at *10. The district court determined that in order to resolve the issue of predominance, it needed to determine whether evidence that Benlate caused injury to plants "would serve any useful purpose in resolving the individual claims given the varied uses of the fungicide and the many consequences of its application." *Id.* at *11.

In denying class certification, the district court in *Dahlgren's Nursery* found:

> The issue of causation, as well as that of negligence, must be subject to a "clear out [sic] determination" with generalized proof before common questions can be found to predominate. Although generalized proof may be well suited for those cases in which the cause of the damages is "a single tragic happening," [i]t is not well suited for those cases in which no one set of operative facts establishes liability and no single proximate cause equally applies to each potential class member.

*Id.* at *12 (internal citations omitted). In discussing the difficulty in making clear-cut determinations on all of the class members claims based on generalized proof, the district court in *Dahlgren's Nursery* noted that:

> To begin with, the manufacture, distribution, and sale of the fungicide is not common throughout the class. The class description identifies five different types of Benlate. Each was formulated, packaged, stored, and distributed over a four year period, in a dozen different campaigns, and by a variety of non-parties to this litigation.

*Id.* Like in *Dahlgren's Nursery*, this case involves many different variables requiring individualized proof. FlexPipe was manufactured and distributed by various entities over a 15–year period. (Report at 18.) Numerous models of FlexPipe were produced by Defendants with different changes in design

and manufacture over the years. (*See* Defendants Canam and Finloc, Inc.'s Memorandum in Opposition to Class Certification, D.E. 546 at 12; Schruben Dec. ¶ 4 (identifying 27 models of FlexPipe sold by Defendants with variations by generation and within particular generations).) Only a small subsection of that FlexPipe is at issue in this case. (*See* Objections at 19 n. 23 (noting Plaintiff CSP has claims for models PP1500, PP 1501, PP1503, SP4000 and SP4500, Plaintiff Twin Oil has claims for PP1500, PP1501, PP1503, PP1503F and CP1503, while Plaintiff JMA has claims for PP1501 and CP1503); Expert Report of Thomas J. Schruben at 19, Ex. C (noting Defendants produced numerous models of FlexPipe and identifying many different constructions of FlexPipe).) In addition, each class member will likely have encountered different installation, maintenance, and environmental conditions in using FlexPipe. As in *Dahlgren's Nursery*, this case simply involves more than can be decided through a showing of generalized proof that a product is generally defective.

As a result, there are "no set of operative facts establishing liability and no single proximate cause [that] equally applies to each potential class member" in this case. (Report at 19); *Dahlgren's Nursery* at *12; *see also Kia Motors Am. Corp. v. Butler,* 985 So.2d 1133, 1141 (Fla.3d Dist.Ct.App.2008). As the Magistrate Judge correctly determined, "[t]he Plaintiffs in our case, like the plaintiffs in *Dahlgren's,* are seeking to certify a class on the basis of general causation-that a defective product can, in a general sense, cause damage." (Report at 18 (emphasis in original).) Similar to *Dahlgren's Nursery,* even if Plaintiffs were able to demonstrate that FlexPipe had a general defect, it would not assist Plaintiffs in meeting their burden of showing that that particular defect was the legal cause of each class member's harm. (*See id.*)

### e. Damages

The individualized nature of determining putative class members' damages also contributes to a lack of predominance in this case. Plaintiffs are correct[8] in their assess-

---

**8.** The Court notes, however, Plaintiffs' objection

that "[t]he R & R's conclusion that 'this case is

ment that "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." (Objections at 16 (quoting *Klay,* 382 F.3d at 1259).) Nevertheless, it certainly does not help. Plaintiffs in this case seek, *inter alia,* damages including remediation of all soil damage as a result of FlexPipe leaks, the costs of monitoring, repairing, and replacing FlexPipe, and consequential damages including business disruption costs. (*See* SAC at 46–47.) Calculating damages for each putative class member would necessarily require significant amounts of individualized proof as to each installation site and individual business. Additionally, the Report is correct in concluding that Plaintiffs' proposed approach for determining punitive damages is improper.

The Report concludes that Plaintiffs' proposed approach to punitive damages is contrary to Florida law because it seeks to determine punitive damages prior to compensatory damages. (Report at 22.) Plaintiffs' proposal, as set forth in their Supplemental Memorandum in Support of Class Certification ("Plaintiffs' Supplement," D.E. 611), includes a three-phase trial plan in which (1) a class-wide jury trial decides all liability issues in phase one; (2) the same jury determines entitlement to punitive damages and a "multiplier" for reprehensibility in phase two; and damages would be assessed and awarded in phase three on an individual basis in a process similar to that used in *Allapattah Services, Inc. v. Exxon Corp.,* 188 F.R.D. 667 (S.D.Fla.1999), *aff'd,* 333 F.3d 1248, 1256–58 (11th Cir.2003). The Court agrees with the Magistrate Judge that having a jury determine a "reprehensibility multiplier" in phase two is creative but contrary to Florida law. Under Florida law, entitlement to punitive damages may be decided once there has been

a finding of liability, even if there has not yet been an award of compensatory damages. *Engle v. Liggett Group, Inc.,* 945 So.2d 1246, 1262 (Fla.2006). However, "the amount of compensatory damages must be determined in advance of a determination of the amount of punitive damages awardable, if any, so that the relationship between the two may be reviewed for reasonableness." *Id.* at 1265. As the Report notes, "[t]his is because due process limits on punitive damages awards require 'an evaluation of the punitive and compensatory amounts awarded to ensure a reasonable relationship between the two.' " (Report at 22 (citing *Engle,* 945 So.2d at 1264; *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 581, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).) Plaintiffs' approach would require the jury in phase two to calculate a basic award of punitive damages without even having established whether any putative class members were harmed by Defendants' conduct or the extent of any such harm. Plaintiffs' approach appears to allow the phase one and two jury to pick a number out of a hat and let the number be applied as a damage multiplier without regard to whether any harm was caused or the amount of such harm. Because Plaintiffs' approach attempts to award punitive damages prematurely, it is contrary to Florida law.

 The Court also doubts Plaintiffs' plan to bifurcate punitive damages in such a way comports with due process or advances interests in judicial economy. Courts must evaluate punitive damages awards to see whether they comply with the due process rights of the defendants. The degree of reprehensibility of the defendant's misconduct is one of three indicia used to evaluate the reasonableness of a punitive damages award.[9] Under Plaintiffs' proposal, numerous individual determinations as to liability

---

wholly unsuited for class-wide treatment because common damage issues do not predominate' " quotes the Report out of context. (*See* Report at 22 ("Similarly, we agree with Defendants that, *as to the issue of damages,* this case is wholly unsuited for class-wide treatment because common damage issues do not predominate.") (emphasis added).)

9. In looking at whether a punitive damages award comports with due process, courts must look at "(1) the degree of reprehensibility of the

defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (citing *Gore,* 517 U.S. at 575, 116 S.Ct. 1589).

and damages would still have to be made in phase three. A special master or claims administrator would have to make findings as to whether the defect established in phase one was the legal cause of each class member's harm, whether the class member suffered any harm, and come up with a punitive damages award (assuming entitlement was determined in phase two) based on the individual harm to each class member and the conduct of each defendant with respect to that class member. Finally, the punitive damages award would still have to be reviewed for reasonableness in light of any compensatory damages award. Essentially, Plaintiffs propose that we trifurcate a trial so that liability, compensatory damages, and punitive damages are awarded by a special master. This case is nothing like *Allapattah* and such a claims process would be inappropriate here. *Allapattah* involved a class of gasoline retailers all similarly affected by the breach of a gasoline supplier's contract to provide discounted gasoline. Apportionment of damages in *Allapattah* came after determination of liability and simply involved the application of mathematical formulas. A similar approach in this case would require hundreds of mini-trials involving issues of liability and damages. Nothing would be gained by such an approach.

### f. Trifurcation and Subclasses

 Plaintiffs continue with their divide and conquer approach to class certification by objecting that the Magistrate Judge failed to adequately consider trifurcation or subclasses as an alternative approach. (Objections at 18–19.) Plaintiffs propose trifurcation where "the first question the jury would answer is: Does FlexPipe suffer from an inherent permeability and chemical incompatibility defect that foreseeably and substantially causes FlexPipe to fail prematurely?" (*Id.* at 19.) Presumably, the jury would then consider liability and damages. Nonetheless, Plaintiffs fail to suggest how trifurcation might benefit the resolution of this case. The resolution of one common threshold question, such as whether FlexPipe was inherently defective, would not significantly advance the litigation or save resources. If this case was trifurcated and the

answer to Plaintiffs' first question was "yes," it would simply mean that identical evidence regarding FlexPipe's defect would be repeated as part of the determination of whether that defect in fact caused any damage. In other words, as stated numerous times above, a finding that FlexPipe is generally defective does nothing to advance Plaintiffs' claims. Similarly, the Magistrate Judge correctly concluded that subclasses would not solve a lack of predominance. There were numerous changes among FlexPipe models and generations throughout the years. (Report at 8.) Even if a subclass was established for each model of FlexPipe, it would not prevent the individualized questions of whether causation or reliance or harm is present from overwhelming any commonalities within subclass. Plaintiffs fail to meet Rule 23(b)(3)'s first prerequisite that common questions predominate individual ones.

### 2. Superiority

Rule 23(b) (3)'s other requirement is that class resolution must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). "To determine if the superiority requirement of Rule 23(b)(3) is satisfied, the Court must consider the following: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of the litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." *Jeld–Wen,* 250 F.R.D. at 695 (citing Rule 23(b)(3)); (*see also De Leon–Granados v. Eller & Sons Trees, Inc.,* 497 F.3d 1214, 1220 (11th Cir.2007)).

The Report finds the predominance of individual inquiries, the substantial nature of potential damages, and issues involving manageability support a finding that class treatment is not superior to other litigation devices available to class members. First, the Report reiterates its previous finding that a lack of predominance would turn this class action into a series of individualized inqui-

ries. Second, the Report finds that this case does not fall within the category of those cases where class certification is superior because the *de minimis* nature of individual claims would preclude individual suits. Plaintiffs' expert Thomas J. Schruben estimates that the average cost of replacing FlexPipe could be close to $200,000 per site. (*See* Motion, D.E. 441 A.2, Schruben Decl. at ¶ 22 (estimating the average cost of replacement of FlexPipe per site between $220,000 to $260,000)). If class members have additional claims for soil remediation or other injuries, and/or own more than one facility with FlexPipe, the damages sought are clearly quite substantial. (*See id.* (estimating the average cost of remediating a petroleum-contaminated site in Florida at $380,000).) The Report concludes, and the Court agrees, that individual class members have a sufficient financial interest in prosecuting individual claims. Finally, the Report finds that any class action determinations "will not relieve this Court from having to adjudicate a slew of individual cases, including many which could not be brought in this jurisdiction on their own, increasing the judicial resources expended by this Court." (Report at 28.)

Plaintiffs object that the Report's superiority analysis "fails to undertake the required comparative analysis of classwide adjudication versus individual litigation, and specifically the factors that make litigation cost-prohibitive for any individual plaintiff." (Objections at 20–21.) Specifically, Plaintiffs object that individual plaintiffs would find litigation cost-prohibitive given the complex nature of FlexPipe and this case in general. (*Id.* at 19–20.) Plaintiffs further argue that the cost of duplicating the enormous discovery conducted thus far, as well as the unnecessary cumulative presentation of evidence, especially with regard to the successor-in-liability claims, would be prohibitively costly and wasteful. (*Id.* at 20.) Finally, Plaintiffs argue that the limited prospects of actual recovery and the "vast expense of individual

litigation" will deter class members from vindicating their rights.

■ The Court finds that a class action is not superior to other methods of resolving this case. The substantial nature of damages here provides a compelling reason to believe individual class members would have an interest in controlling the litigation individually. Where the claims at issue do not involve *de minimis* sums, individuals are more likely to have an interest in filing suit. *See Jeld-Wen*, 250 F.R.D. at 696 ("In addition, the claims at issue here do not involve a *de minimis* sum so that an individual plaintiff would be discouraged from filing his own suit") (emphasis in original) (citing *Klay*, 382 F.3d at 1270). Individual class members have even more interest in controlling litigation where, as here, Plaintiffs seek to certify a class that comprises both former owners and current owners of FlexPipe. Even if perhaps not enough to rise to the level of a conflict of interest for purposes of the Rule 23(a) adequacy analysis, there may be divergent interests or remedies sought between former owners of FlexPipe and current owners. The record is not clear regarding the extent and nature of any similar litigation already commenced by or against members of the class, but it appears that at least one class action lawsuit has been filed in an Alabama state court alleging similar issues against at least some of the defendants in this case.[10] As a result, the second factor of the superiority analysis neither supports nor counsels against class certification. Similarly, there appears no substantial interest in concentrating the litigation in this particular forum.

Finally, the Court must consider whether any difficulties in managing the litigation counsel against class certification. The Court finds that the same issues preventing common questions from predominating individual ones, also weigh against a class action

**10.** A similar class action alleging defective FlexPipe was filed in the Circuit Court for Bullock County, Alabama, by a distributor of gasoline and owner of several gas stations against TCI, Dayco, CT, and Mark IV Industries (dismissed from this action on March 11, 2008) (*See* D.E. 549), among others. *See May's Distrib. Co., Inc.,*

*et al v. Total Containment, Inc., et al,* Civil Case No. CV–03–02, Circuit Court of Bullock County, Alabama (January 3, 2003); *May's Distrib. Co., Inc., et al v. Total Containment, Inc., et al,* 523 F.Supp.2d 1303 (M.D.Ala.2007) (granting Plaintiffs motion to remand back to state court and providing a procedural history of case).

as the superior method of resolving this case. The more individual issues predominate common ones, the more difficult it is to manage a class action. *See Jeld–Wen,* 250 F.R.D. at 696 ("Furthermore, the difficulties in managing the class action are great, given the predominance of the individual issues discussed above."). The fact that there is a common nucleus of operative facts and common legal theories does not mean this case would be appropriately manageable as a class action. The numerous plans proposed by Plaintiffs for managing this case as a class action (i.e., bifurcation of punitive damages involving a "reprehensibility multiplier," trifurcation, subclasses), further suggest a class action is unmanageable here. As a result, after considering the Report, Objections, and the Rule 23(b)(3) factors for determining superiority, it is the Court's conclusion that a class action is not superior to other methods of litigating this matter.

### C. Rule 23(c)(4) Partial Certification

Plaintiffs argue that in the event the Court finds class certification inappropriate under Rule 23(b)(3), the Court could alternatively certify a class for resolution of certain issues. (Plaintiffs' Supplement, D.E. 611 at 8–12.) In support of this argument, Plaintiffs state "[a]lthough Rule 23(b)(3) and Rule 23(c)(4) differ in their focus, they are functionally equivalent: both recognize the presence of both common and individual issues in class actions, and both seek to provide the Court with the tools it needs to manage litigation efficiently and determine which common issues are of sufficient significance to warrant class treatment." (*Id.* at 9.) Therefore, Plaintiffs argue, "[e]ven if this Court determines that this case as a whole does not meet the predominance requirements under Rule 23(b)(3) (though it does), then it could still certify the direct and indirect liability issues and the entitlement to and a formula for punitive damages under Rule 23(c)(4)." (*Id.* at 10.)

The Magistrate Judge determined that even if it could certify issues despite a lack of predominance as a whole under Rule 23(c)(4), it would not do so in this case. The Report states:

> We doubt, however, that Plaintiffs' inability to satisfy the predominance and superiority factors ever allows the Court to rely on Rule 23(c)(4). But, even if we could, for the reasons articulated above, particularly the need to try causation and damages on an individual basis here, we decline to recommend that such a course be taken. No single issue is best addressed on a classwide basis involving multiple variations of the FlexPipe product and multiple defendants.

(Report at 28 n. 5.) Plaintiffs object that the "the R & R gives inadequate consideration to certification of particular issues" and reaches a conclusion "contrary to the overwhelming weight of authority." (Objections at 8.) Plaintiffs argue that despite a Circuit split as to whether Rule 23(c)(4) permits class-wide adjudication of common issues absent a lack of overall predominance, the majority of Circuits support such an approach.[11] (Objections at 22.) Plaintiffs then point to several district court decisions within our Circuit supporting issue certification under Rule 23(c)(4). (Objections at 24 (citing *In re Tri-State,* 215 F.R.D. 660, 697–700 (N.D.Ga.2003) (certifying class in multi-district litigation as to the majority of plaintiffs' claims that satisfied predominance test); *Hernandez v. Motor Vessel Skyward,* 61 F.R.D. 558, 561 (S.D.Fla.1973) (granting certification on issue of negligence under Rule 23(b)(1)(A) and 23(c)(4)); *Fabricant v. Sears Roebuck,* 202 F.R.D. 310, 317 (S.D.Fla.2001) (certifying class under Rule 23(c)(4) where class members claims under Truth in Lending Act predominated individual questions)).)

However, the cases cited by Plaintiffs involve either certification under Rule 23(b)(1) or 23(b)(2) (which do not require predominance), multi-district litigation, and/or predominance was present as to the cause of action as a whole. In addition, this case is very different from *In re Copley Pharmaceutical, Inc.,* 161 F.R.D. 456 (D.Wyo.1995), also cited

---

11. The Court notes that a difference of opinion exists between the Circuits as to the proper place of Rule 23(c)(4) issue certification where predominance lacks as to the cause of action as a whole and that the Eleventh Circuit has not provided clear guidance on this issue.

by Plaintiffs, which involved multi-district litigation of "albuterol" products liability claims. The plaintiffs in *In re Copley,* brought a class action products liability lawsuit against the manufacturer of contaminated asthma medicine. The district court certified a class under Rule 23(c)(4) and 23(b)(3) to determine common issues of liability: strict liability, negligence, negligence per se, breach of warranties and declaratory relief. (*Id.* at 458). The district court in *In re Copley,* also implemented a bifurcated trial plan whereby a jury would determine any common factual issues going to the defendant's liability and then separate trials would be conducted in the transferor districts that would determine individual causation and membership in the class. (*Id.* at 461–62). The defendant in that case, however, only challenged certification on two grounds: that having separate juries determine negligence violated its Seventh Amendment rights and that a class action lacked superiority because courts would have to apply the laws concerning negligence and products liability of many different states. (*Id.* at 458). Unlike this case, the discussion in *In re Copley* assumed the existence of common questions that predominated individual ones. *In re Copley* also involved a single defendant who admitted that at least some of its product was contaminated and that it was liable for any resulting injuries. *Id.* at 465. Additionally, the court found suspicious the defendant's decision to delay its motion to decertify the class until two months before trial. *Id.* at 459 n. 1.

The Court also notes that many other courts "have emphatically rejected attempts to use the (c)(4) process for certifying individual issues as a means for achieving an end run around the (b)(3) predominance requirement." *O'Neill v. Home Depot U.S.A., Inc.,* 243 F.R.D. 469, 481–82 (S.D.Fla.2006) (quoting *Fisher v. Ciba Specialty Chemicals Corp.,* 238 F.R.D. 273, 316 (S.D.Ala.2006)); *see also Rink v. Cheminova, Inc.,* 203 F.R.D. 648 (M.D.Fla.2001) (review dismissed as moot by *Rink v. Cheminova, Inc.,* 400 F.3d 1286 (11th Cir.2005)); *Castano,* 84 at 745. In *O'Neill,* a group of Florida plaintiffs brought a class action lawsuit against a home improvement chain alleging deceptive and unconscionable practices relating to a "damage

waiver" fee added to rental contracts. 243 F.R.D. at 471. Among the arguments raised in *O'Neill,* plaintiffs asserted that whether the damage waiver was a worthless product was a claim that could be certified regardless of whether the other claims merited certification. *Id.* at 481. The district court determined that Rule 23(c)(4) did not allow it to sever single issues for certification where individual issues of causation precluded a finding of predominance. *Id.* at 481–82.

Nonetheless, the Court finds discussion of whether Rule 23(c)(4) allows certification absent predominance superfluous as there are no issues in this case proper for such certification. Plaintiffs suggest in their Objections that a class could be certified to answer the following common questions:

(1) are the pipes defective? (2) did Defendants know they were defective? (3) is the defect material? (4) did Defendants owe purchasers a duty to disclose the defect? (5) did Defendants breach their warranty? (6) does *American Pipe* tolling apply to the claims? (7) to what extent does the economic loss rule apply? (8) what punitive damages standard applies? (9) are the alter-ego defendants liable under the successor-in-interest, piercing the corporate veil and/or alter-ego theories? (10) to what extent are claims recoverable under the Commerce & Industry insurance policies?

(Objections at 25.) Similar to the discussion above, many of these questions are either not easily determined on a class-wide basis or their resolution would not advance Plaintiffs' claims. The Court agrees with the Magistrate Judge that "no single issue is best addressed on a class-wide basis involving multiple variations of the FlexPipe product and multiple defendants." (Report at 28.) Certification is also improper under Rule 23(b)(1).

### D. Rule 23(b)(1) "Limited Fund" Certification

 Rule 23(b)(1) provides that a class may be certified if the requirements of Rule 23(a) are satisfied and if:

[P]rosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or vary-

ing adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Plaintiffs object that the "R & R altogether ignores Plaintiffs' requests for certification against TCI under Rule 23(b)(1)" and that "TCI's insurance policies are like a 'limited fund' at risk of depletion by a few plaintiffs if this case is not treated like a class action under Rule 23(b)(1)." (Objections at 26.) The Court finds that certification under a "limited fund" theory is inappropriate because the record indicates none of the named Plaintiffs filed timely claims to collect against TCI's insurance policy [12] and no limited fund exists where Plaintiffs are also seeking damages from TCI's successors via their indirect liability claims. Nor have Plaintiffs made any showing regarding the amount of aggregated unliquidated damages sought or the availability of those funds. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). As a result, the Court cannot certify a class in this case under Rule 23(b)(1) or any other provision of Rule 23. Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1. Plaintiffs' requests for oral argument on the issue of class certification are **DENIED**;

2. The Report of the Magistrate Judge (D.E.663) is **ADOPTED consistent with this Order;**

3. Plaintiffs' Motion for Class Certification, filed on December 7, 2007 (D.E. 441), is **DENIED.**

**DONE AND ORDERED.**

---

12. In his Report and Recommendation on AIG's Motion for Partial Summary Judgment (D.E. 680), recommending summary judgment be granted, the Magistrate Judge notes that none of the named Plaintiffs in this case filed a timely claim against TCI under AIG's policy. As no objections were filed, the Court adopted the Magistrate Judge's Report, granting AIG's motion for partial summary judgment (D.E.379) and deny-

## REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EDWIN G. TORRES, United States Magistrate Judge.

This matter is before the Court upon Plaintiffs' Motion for Class Certification [D.E. 441] and related filings.[1] The parties thoroughly briefed the issues raised by Plaintiffs' motion, and oral argument was held on October 8, 2008. Based on careful consideration of the parties' written and oral arguments, the exhibits submitted in support of and opposition to class certification, the court file, and applicable law, the undersigned recommends that Plaintiffs' motion for class certification be Denied.

### I. BACKGROUND

This case involves thermoplastic flexible piping ("FlexPipe") marketed and distributed by Defendant Total Containment, Inc. ("TCI") for use in underground fuel containment systems to enable petroleum fuels to be pumped from underground storage tanks to above-ground fuel dispensers such as those used to fill vehicles' fuel tanks. Plaintiffs are the City of St. Petersburg, Florida ("City"), Twin Oil Company ("Twin Oil"), and Jeff Montgomery Associates ("JMA") (collectively, "Plaintiffs"), each of which purchased and installed or otherwise used FlexPipe at its fuel dispensing facilities and retail gasoline stations, respectively.

Plaintiffs allege generally that the Defendants in this case designed, manufactured, marketed, distributed, and sold to them Flex-Pipe that Defendants knew or should have known was fundamentally unsuitable for its intended purpose of conveying and containing petroleum fuels from underground storage tanks to aboveground fuel dispensers. Plaintiffs further allege that Defendants en-

ing as moot AIG's motion for separate trial (D.E. 581).

---

1. The Honorable Joan A. Lenard referred this case to the undersigned Magistrate Judge for report and recommendation on all dispositive motions. [D.E. 462].

gaged in a fraudulent scheme to market and sell defective FlexPipe for profit, knowing that the product was defective and not approved for sale by federal and state regulatory agencies. Finally, Plaintiffs allege that, as a result of Defendants' conduct, they purchased FlexPipe that has deteriorated and/or is deteriorating, resulting in physical damage to the FlexPipe itself and other components of Plaintiffs' fuel containment, conveyance, and delivery systems, and fuel leaks that contaminate the surrounding environment and require costly mediation. More specifically, Plaintiffs' complaint contains the following allegations against the various Defendants: (1) negligence (Count I); (2) strict products liability (Count II); (3) intentional fraudulent concealment (Count III); (4) fraud in the inducement (Count IV); (5) negligent misrepresentation/ concealment (Count V); (6) breach of express warranty (Count VI); and (7) unjust enrichment (Count VII). [D.E. 211 ("Plaintiffs' Second Amended Class Action Complaint for Declaratory and Injunctive Relief and for Damages")].

At the heart of this litigation is Plaintiffs' claim that "[a]ll of the FlexPipe is defective because it does not perform as intended during its reasonably expected life, and the defect is uniform and inherent in the FlexPipe." [D.E. 441 at 4]. Plaintiffs assert that FlexPipe cannot function as designed because it is not sufficiently impermeable in two ways: it allows too much fuel to pass from the inner barrier to other layers of the pipe, and it allows too much fuel to pass from the secondary containment pipe to the primary pipe. [*Id.*] Plaintiffs also claim that FlexPipe is chemically incompatible with the petroleum fuels it is exposed to under normal operating conditions. [*Id.*] This defect, Plaintiffs say,

is inherent and common across all brands and models of FlexPipe.... The defect causes FlexPipe to fail prematurely and leak fuel, resulting in physical damage to other equipment and the release of fuel into the surrounding environment. This uniform defect begins to manifest immediately and progressively upon the introduction of fuel into the FlexPipe.

The defect is not the result of poor installation or maintenance. Because FlexPipe is permeable to and chemically incompatible with fuel, neither perfect installation nor maintenance can stop FlexPipe from failing.... Thus, regardless of whether an owner of FlexPipe installs and maintains FlexPipe perfectly, the normal, foreseeable operating conditions will cause FlexPipe to fail prematurely.

[*Id.* at 5 (internal citations omitted) ]. Plaintiffs claim that thousands of business owners in the State of Florida each have suffered thousands of dollars in damages in replacement and remediation costs and business interruption losses. [*Id.* at 2].

Plaintiffs ask this Court, pursuant to Federal Rule of Civil Procedure 23, to certify a class comprised of:

[a]ll persons and entities in the State of Florida (a) who presently own thermoplastic flexible piping ("FlexPipe") (including but not limited to that sold under the brand names "Enviroflex," "Omniflex," and "Monoflex") or (b) who formerly owned FlexPipe located in the State of Florida, and incurred any expense associated with (1) repair or replacement of all or part of the FlexPipe, and/or (2) a fuel leak from the FlexPipe.

[D.E. 441 at 2]. Plaintiffs propose a three-phased class-action trial. [D.E. 611]. In Phase 1, a jury would try all the direct and indirect liability claims. [*Id.* at 3–4]. Assuming a finding of liability, the trial would then progress to Phase 2 during which the same jury would determine Plaintiffs' and Class members' entitlement to, and a multiplier formula for, an award of punitive damages against Defendants. [*Id.* at 4–6]. Finally, in Phase 3, Plaintiffs propose that the Court implement an *Allapattah*-type claims process for assessing and awarding damages on an individual basis. [*Id.* at 6–8 (citing *Allapattah Services, Inc. v. Exxon Corp.*, 188 F.R.D. 667, 677 (S.D.Fla.1999), *aff'd*, 333 F.3d 1248 (11th Cir.2003)) ]. Defendants oppose the motion for class certification.

## II. ANALYSIS

Federal Rule of Civil Procedure 23 establishes the requirements for certifying a class action in federal court. The burden is on the party seeking certification to prove entitle-

ment to class certification. *Jones v. Jeld–Wen, Inc.*, 250 F.R.D. 685, 692 (S.D.Fla. 2008). The moving party must satisfy all the prerequisites of Rule 23(a) and at least one of the subsections of Rule 23(b). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 513, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Here, Plaintiffs seek class certification pursuant to Rules 23(a) and (b)(3). A class action may be certified only if the trial court is satisfied, "after a rigorous analysis," that the prerequisites of Rule 23 have been met. *General Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). A court is not to determine the merits of the case at the certification stage though "[s]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* at 160, 102 S.Ct. 2364. A court has broad discretion in deciding whether to certify a class. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir.2004); *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 624 (S.D.Fla.2008).

## A. Rule 23(a) Requirements

Plaintiffs first must satisfy the four requirements of Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These requirements are commonly referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. If Plaintiffs fail to satisfy any one of these four, the case may not proceed as a class. *Cohen*, 259 F.R.D. at 624.

### 1. Numerosity

Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Joinder need not be impossible but merely difficult or inconvenient. *Cohen*, 259 F.R.D. at 631. There is no fixed rule; what constitutes numerosity depends on the facts of each case and may involve consideration of factors such as, e.g., the size of the class and geographic dispersion of class members. *See, e.g., Jeld–Wen, Inc.*, 250 F.R.D. at 692–93; *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 489–90 (S.D.Fla.2003). In this circuit, "[g]enerally, 'less than twenty-one is inadequate, more than forty adequate.'" *Cheney*, 213 F.R.D. at 490 (quoting *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.1986)). The sheer number of possible class members may warrant a conclusion that numerosity is satisfied. *Jeld–Wen*, 250 F.R.D. at 693. Parties seeking class certification need not know the exact number of class members but they "must make reasonable estimates with support as to the size of the proposed class." *Id.* (internal citation omitted).

Here, Plaintiffs claim the number of class members is likely in the hundreds. They note that TCI previously stated that Flex-Pipe was installed in over 8,450 locations in Florida during the relevant time period, but they believe that the number of sites in which Dayco/Cleveland Tubing FlexPipe was installed is significantly less than that, i.e., approximately 4,000 sites. [D.E. 611 at 7–8 n. 5; D.E. 619, Ex. 1 at 1]. Because many putative class members own multiple fueling stations, Plaintiffs suggest the size of the class probably numbers in the hundreds, not thousands. [D.E. 611 at 7–8 n. 5; D.E. 619, Ex. 1 at 1–2]. We have no difficulty determining that the numerosity requirement has been satisfied.

### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "Commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the representative plaintiff in relation to the class." *Cohen*, 259 F.R.D.

at 631–32 (citing *Prado–Steiman v. Bush,* 221 F.3d 1266, 1279 (11th Cir.2000)). The rule does not require that *all* of the questions of law or fact raised in the case be common to *all* the plaintiffs, just that there be at least one issue that affects all or a significant number of proposed class members. *Clausnitzer v. Federal Express Corp.,* 248 F.R.D. 647, 656 (S.D.Fla.2008). "The threshold for commonality is not high .... [and f]actual differences between class members do not necessarily preclude a finding of commonality. The requirement is met if the questions linking the class members are substantially related to the resolution of the litigation even though the individuals are not identically situated.' " *Id.* (internal citations omitted).

Plaintiffs assert that the common questions of law and fact raised in this case relate to the defective nature of FlexPipe, Defendants' knowledge regarding that defect, Defendants' duty to disclose information about the defect, and Defendants' contractual (warranty) and common law duties relating thereto. [D.E. 441 at 11]. For their part, Defendants challenge the underlying premise of Plaintiffs' case, that all flexible piping is uniformly defective and that the alleged defect has caused and will continue to cause fuel leaks. One of their chief arguments in opposition to this "uniform defect" theory is that many significant differences exist in the piping that was manufactured by Defendants TCI, Dayco, Cleveland Tubing, and/or Polyflow over a 15–year period. [*See, e.g.,* D.E. 546 at 12]. They cite Plaintiffs' expert, Thomas J. Schruben, who recognized that Defendants sold at least 27 models of Flex-Pipe over the relevant time period that can be divided into five generations, and that there were several versions within some of the generations that used different plastics. [*Id.* (citing D.E. 445, Ex. 2 ¶ 4) ].

Defendants have challenged (through *Daubert* motions) the opinions of Mr. Schruben and Dr. Charles A. Daniels, Plaintiffs' other expert who also opined that all FlexPipe was uniformly defective. Defendants' challenge is based in part on the failure of these experts to test each and every model or generation of flexible piping alleged to be defective and instead to rely for their opinions on only a small sample of piping that was actually tested. [*Id.* at 12–13]. Defendants assert that examination of the different generations and constructions of flexible piping manufactured by Defendants over the relevant time period reveals there are in fact significant differences among them. [*See, e.g., id.* at 13–14 (citing D.E. 529, Ex. B (Shah Decl.)) ].

For reasons discussed in greater detail below in connection with the predominance requirement of Rule 23(b)(3)), we agree with Defendants that there were sufficient changes among the models and generations of pipes over the years, and too many variables in terms of installation, maintenance, leak detection, history of each site, and other factors, to question whether there are enough common questions of fact and law between the named Plaintiffs and each of the putative class members. Resolution of whether and why a particular piece of Flex-Pipe failed will likely require a great deal of individualized proof that will likely not be applicable on a class-wide basis.

That being said, the threshold necessary to satisfy the commonality prong is not onerous. Plaintiffs have been able to articulate sufficient common issues of law and fact that they can point to overcome that minimal showing. *See, e.g., Mullen v. Treasure Chest Casino LLC,* 186 F.3d 620, 625 (5th Cir.1999) ("The test of commonality is not demanding."); *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998) (common nucleus of operative fact will usually satisfy Rule 23(a)(2) and factual variations among class members are not enough to defeat commonality). And though the issue is certainly close, we should find that Plaintiffs have minimally carried their burden under the commonality prong of Rule 23(a).

### 3. Typicality

Under Rule 23(a), "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "The key inquiry in determining whether a proposed class has 'typicality' is whether the class representative is part of the class and possesses the same interest and suffers the same injury as the class members." *Clausnitzer,* 248 F.R.D. at 656 (citation omitted). Typicality requires that the claims of the named repre-

sentative bear the same essential characteristics of the claims of the class at large. *Id.* The named representative's claims need not be identical to class members' claims as long as they "arise out of the same conduct and are grounded on the same legal theory." *Jeld–Wen,* 250 F.R.D. at 694. "The test for typicality, like commonality, is not demanding." *Id.* (citation omitted).

Plaintiffs note the proposed class consists of businesses, cities, and other entities in the State of Florida that own FlexPipe manufactured after June 1990. Plaintiffs claim to be typical because they own FlexPipe and allege that Defendants engaged in a common course to sell a known defective product and to conceal the nature of that defect from end-users. [D.E. 441 at 11]. Plaintiffs'. argument is premised on their "uniform defect" theory. On the other hand, the three named Plaintiffs installed only a small fraction of the different models of FlexPipe alleged to be defective. Thus, the particular claims of the named Plaintiffs concerning whether Flex-Pipe is defective, whether Defendants knew of the alleged defect in FlexPipe, whether Defendants owed a duty to disclose the alleged defect, etc., are not necessarily typical of those of the proposed class. They all installed different pipes and experienced different installation, maintenance, system configuration, and physical and environmental conditions (to name a few) at their sites. Moreover, the named Plaintiffs' warranty claims are not necessarily typical of all other members of the class, especially as it relates to the particular warranty that applied at a given time and how that warranty was relied upon by most members of the class. Their ability to defend against Defendants' statute of limitations defenses are also not necessarily typical of other members of the class.

Again, however, even these real differences between a representative's claims and those of the class are not dispositive of typicality question under Rule 23(a). The named Plaintiffs here are largely in the safe footing as most other members of the proposed class. There certainly is a strong similarity between these Plaintiffs' claims and those belonging to the class as a whole. To a great degree these Plaintiffs together represent a wide cross-section of the class members who would have similar claims against these Defendants. All these factors support a showing of typicality here. *See, e.g., Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.1985) ("strong similarity of legal theories" may satisfy typicality requirement even if factual differences exist); *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir.1996) ("Factual variations in the individual claims will not normally preclude [typicality] if the claim arises from the same course of conduct as the class claims, and gives rise to the same legal or remedial theory."); *Armstrong v. Davis,* 275 F.3d 849, 868–69 (9th Cir.2001) (class representatives should have similar, though not identical, injuries and should include parties who have suffered cross-section of injuries).

And because, like commonality, the showing required for typicality is not demanding, *Mullen,* 186 F.3d at 625, Plaintiffs have also satisfied the typicality prong of Rule 23(a) notwithstanding their failure to show a uniform defect in the different variations of FlexPipe that apply to the class as a whole.

### 4. *Adequacy of Representation*

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1189 (11th Cir.2003) (citation omitted). In addition to looking at the adequacy of the named representatives, we also must examine the adequacy of the representatives' counsel. *Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours & Co.,* No. 91–8709–CIV, 1994 WL 1251231, at *6–*7 (S.D.Fla. Oct.30, 1994). Counsel will be deemed adequate if they are shown to be qualified, adequately financed, and possess sufficient experience in the subject matter of the class action. *Id.* at *7.

We find the named Plaintiffs do not have any apparent substantial conflicts of interest with potential class members, they are ac-

tively participating in this litigation, and would adequately represent the interests of potential class members. As for Plaintiffs' counsel, they are well-qualified to prosecute this action on behalf of their clients and have demonstrated skill in pursuing this litigation. Plaintiffs have, therefore, satisfied the adequacy prong of Rule 23(a).

Accordingly, the Plaintiffs have crossed their first hurdle in showing that Rule 23(a) has been satisfied. The next hurdle, however, presents a more difficult problem.

### B. Rule 23(b)(3) Requirements

In addition to satisfying the prerequisites of Rule 23(a), a plaintiff seeking class certification must also meet the requirements of Rule 23(b)(3). This subsection requires that (a) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Even if our analysis of Rule 23(a) is arguable, we conclude that the Rule 23(b)(3) issue amounts to a clear and convincing death knell to Plaintiffs' attempt to certify a class.

#### 1. Predominance

Under the predominance prong of Rule 23(b)(3), "[i]t is not necessary that all questions of law or fact be common, but only that some questions are common and that they predominate over individual questions." Jeld–Wen, 250 F.R.D. at 694 (citing Klay, 382 F.3d at 1254). The predominance requirement, though similar to the commonality prerequisite of Rule 23(a), is "far more demanding." Id. at 694 (citation omitted). "A question is deemed 'common' 'when there exists generalized evidence that proves or disproves the element on a simultaneous, class-wide basis. Such proof obviates the need to examine each class member's individual position.'" Dahlgren's, 1994 WL 1251231, at *9 (citation omitted). Our focus is on whether the individual questions in this case "are so overwhelming as to destroy the utility of a class action." Id. (citation omitted).

As we have already stated, the essence of Plaintiffs' claims is that all of the FlexPipe

suffers from the same manufacturing and design defect; that is, all FlexPipe is permeable to and chemically incompatible with the fuel it is intended to carry, and that the defect in FlexPipe manifests itself immediately and progressively upon the introduction of fuel. This in turn causes the pipe to fail prematurely and leak fuel. Plaintiffs posit that the Defendants engaged in the design and manufacture of FlexPipe (TCI, Dayco, Polyflow, and Cleveland Tubing) failed to follow industry standards and guides for testing thermoplastic piping; disregarded known environmental conditions to which their pipes would be exposed; and failed to devise and implement a "root cause analysis program" to determine the underlying causes of the problems with their pipes in Florida. [D.E. 441 at 13–14]. Defendants knew the pipes were defective yet they allowed them to be marketed and sold by TCI. According to Plaintiffs, class treatment is appropriate because:

> the Defendants' conduct foreseeably and substantially proximately caused the damages suffered by Plaintiffs and Class members. According to Plaintiffs' experts, the defect—not individual installation or maintenance issues—substantially caused the damages. That Defendants may be able to show that other factors affected the Flex-Pipe is irrelevant because Plaintiffs will be able to show that the defect substantially caused the FlexPipe to fail.

[Id. at 14]. Plaintiffs also posit that, because the defect was uniform across all versions of flexible piping, causation can be determined on a class-wide basis and any potential causes are irrelevant. [D.E. 612 at 3].

Plaintiffs suggest that the following questions of law and fact relating to "core direct liability claims" are common to all class members and predominate over any individual questions: is FlexPipe uniformly defective? did Defendants know FlexPipe was defective; is the defect material to a reasonable purchaser; did Defendants owe purchasers a duty to disclose the defect; and what warranty did Defendants extend to purchasers and did they breach it? [D.E. 611 at 3]. Plaintiffs contend that resolution of these questions will require the same evidence and

testimony and will not vary between individual class members. [*Id.* at 3–4].

As previously discussed, Defendants vigorously dispute the notion that this case involves a "uniform product." Rather, their position is that there are *multiple* products that were designed by different companies; manufactured by different companies at different and overlapping times; consisted of different raw materials, layers of construction, corrugation profiles, and specified wall thicknesses; installed by different contractors; and operated and maintained by different individuals or entities. [*See, e.g.,* D.E. 614 at 3]. Defendants argue that the degree of variation in the evidence, even among the three named Plaintiffs, is vast, and many witnesses and documents will need to be examined to resolve individualized questions such as: which pipe was installed, when and how and by whom; which components (such as tanks, sumps, couplings) were installed with the pipe; how the pipe was maintained; whether the pipe leaked and if so, why; what type of leak detection systems were installed; the historic use of the property; the degree of environmental contamination, if any, at the site; whether the facility owner sustained damage as a result of a leak; reliance on Defendants' differing representations, if any, and compliance with the warranty terms; and whether the statute of limitations bars any of the claims.

To satisfy predominance the Plaintiffs must show that their claims in this case are susceptible to class-wide treatment. That is a difficult task indeed. For instance, under Florida law, a products liability claim based on either negligence or strict liability law requires proof of proximate causation and damages. *See, e.g., Pinchinat v. Graco Children's Products, Inc.,* 390 F.Supp.2d 1141, 1148 (M.D.Fla.2005) (strict product liability under Florida law requires proof that (1) a product (2) produced by a manufacturer (3) was defective or created an unreasonably dangerous condition (4) that proximately caused (5) injury); *Marzullo v. Crosman Corp.,* 289 F.Supp.2d 1337, 1342 & n. 5 (M.D.Fla.2003) (basic elements of a products liability claim based on negligence are (1) a duty of care, (2) breach of that duty (or

negligence), (3) proximate cause, and (4) a showing that the product was defective or unreasonably dangerous; the elements of a strict liability claim are the same with the exception that the plaintiff need not prove specific acts of negligence). Given all the individualized issues at play here, Plaintiffs cannot systematically prove on a class-wide basis that the alleged uniform defect in Defendants' various products is the proximate cause of each of the representative Plaintiffs' and putative class members' alleged damages.

*Dahlgren's* is an analogous case that illustrates the point. That case involved strict liability and negligence claims against the manufacturer of certain fungicides referred to as "Benlate" that, when applied to plants and other vegetation, allegedly destroyed or otherwise harmed the plants. 1994 WL 1251231, at *1. In seeking certification of a class of Benlate users, the plaintiff claimed that it could establish the defendant's liability with generalized proof that class members purchased Benlate during the relevant period and that plants and other vegetation to which Benlate was applied thereafter suffered symptomatic distortions. *Id.* at *10. The plaintiff argued that the jury could infer from such a showing that Benlate was defective and caused harm to class members' plants. *Id.* The defendant countered that "determining whether Benlate *can* cause plant harm in general in no way resolves whether Benlate *did in fact* cause any individual grower's particular harm." *Id.* (emphasis in original).

To resolve the predominance issue, our district court considered whether proof that Benlate caused injury to plants "would serve any useful purpose in resolving the individual claims given the varied uses of the fungicide and the many consequences of its application." *Id.* at *11. The court noted that because both the negligence and strict liability claims included "causation" as an element of the claim, evidence that tended to prove or disprove "legal cause" would be critical to the outcome of the case. *Id.* As the court explained:

The issue of causation, as well as that of negligence, must be subject to a "clear out determination" with generalized proof be-

fore common questions can be found to predominate. Although generalized proof may be well suited for those cases in which the cause of the damages is "a single tragic happening," [i]t is not well suited for those cases in which no one set of operative facts establishes liability and no single proximate cause equally applies to each potential class member. Generalized proof is also inapposite where the damages do not lend themselves to mechanical calculation but instead depend on facts peculiar to each class member.

*Id.* at *12 (internal citations omitted).

Our court ultimately determined that the strict liability and negligence claims were not subject to a clear-cut determination with generalized proof. *Id.* The manufacture, distribution, and sale of Benlate were not common throughout the class because there were five different types of Benlate; each was formulated, packaged, stored, and distributed over a four-year period by a variety of non-parties. *Id.* The issues of causation and damages were even more individualized, the court said. *Id.* Benlate interacted differently with different plant types, and the alleged harm varied substantially among the users. *Id.* Accordingly, the court concluded that, even if the plaintiff *could* show that Benlate caused plant damage, "it would not significantly advance this litigation or reduce the complexity of the individual issues remaining for later determination." *Id.* Further, calculation of the damages issues would be even more burdensome because it could not be reduced to a simple formula; rather, it would have required an appraisal of thousands of individual claims, each with discovery, experts, cross-examination, and documents. *Id.* For these reasons, the court held that the plaintiff had not satisfied the predominance requirement of Rule 23(b)(3) and that certification of a class was inappropriate. *Id.*

The Plaintiffs in our case, like the plaintiffs in *Dahlgren's,* are seeking to certify a class on the basis of general causation—that a defective product can, in a general sense, cause damage. But, as Defendants point out, determining causation is an individual-specific enterprise. Plaintiffs cannot show that causation here is susceptible to generalized proof on a class-wide basis because determining whether there is a uniform defect in certain models of FlexPipe in no way resolves whether the defect did in fact cause any individual class member's harm.

In addition to pointing to the numerous constructions of flexible piping that were manufactured by various entities over a 15-year period, Defendants point to two incidents in which flexible piping leaked for reasons other than the alleged uniform defect. In 1998, Twin Oil reported a leak from Enviroflex hose at the North Miami Beach station. Plaintiffs have stated that the hose broke and they do not claim that the failure resulted from the defect at issue in this case. [D.E. 614 at 7 (citing D.E. 503 at 10)]. In 2002, Jeff Montgomery Associates reported a leak in flexible piping that was caused by a loose connection or loose fitting, not the alleged uniform defect. [*Id.* (citing Montgomery Dep. (Feb. 27, 2007) at 132 and 145–46, Ex. 53)]. In addition, Defendants cite the discovery at a JMA site of a secondary containment hose that was breached and apparently patched with duct tape, then painted to hide the breach. [*Id.* (citing Montgomery Dep. (June 19, 2007) at 326–27)]. The hoses cited in these three examples were not preserved so there is no way to know precisely why each failed.

These examples, Defendants say, demonstrate the need for an individualized analysis of each hose removed from each putative class member's site. It will be necessary to determine if the hose failed because of the alleged uniform defect or for some other reason such as improper installation, improper maintenance, or any other reason.

We agree with Defendants that we cannot simply subscribe to Plaintiffs' "uniform defect" theory that all models of FlexPipe suffer from the same defect, notwithstanding changes in those models over the years. We think instead that there is "no one set of operative facts establishing liability and no single proximate cause [that] equally applies to each potential class member." *Dahlgren's,* 1994 WL 1251231, at *12. The representative Plaintiffs and the putative class members used different models of flexible piping manufactured by different companies

at different times and at different locations that were installed in different locations under different circumstances. We have already determined (in connection with the Dayco Defendants' motion for summary judgment) that after the Supply Agreement between Dayco and TCI ended in 1997, TCI altered the design and construction of the primary hose used in TCI's secondary containment system such that Dayco could not be held liable for alleged defects in pipe it did not manufacture. [D.E. 629 at 24–25].[2] We found that TCI's modifications—eliminating one layer of hose and changing the bonding process—resulted in a product that was "simply not the same product that Dayco designed and manufactured." [*Id.* at 25].

Many changes in design and manufacture occurred over many years in the flexible piping sold to the named Plaintiffs and putative class members. Consequently, we believe there will be numerous individualized issues to be determined with regard to the proximate cause of each plaintiff's damages, many of which have already been mentioned. Plaintiffs will be required to "introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims." *Jeld–Wen,* 250 F.R.D. at 695 (citing *Klay,* 382 F.3d at 1266). Resolution of these individualized issues will "break . . . down into an unmanageable variety of individual legal and factual issues," *id.* (citation omitted), and that makes this case unsuitable for class treatment. The need to determine causation on an individual basis does nothing to resolve the individual claims of the class. *See, e.g., Dahlgren's,* 1994 WL 1251231, at *11 (citing with approval *Mertens v. Abbott Labs.,* 99 F.R.D. 38, 41 (D.N.H.

1983), in which the court held: "In light of the varied degrees of use, exposure and harm in each Plaintiff's case, a determination in principle [that a particular drug caused injury *in utero* ] would serve no useful purpose in resolving the individual claims made in this action."); *Kia Motors Am. Corp. v. Butler,* 985 So.2d 1133, 1137–38 (Fla. 3d DCA 2008) (proof of deficiencies in the plaintiff's vehicle would not advance the cause of class-wide relief for any other class members because the brake systems found in the different vehicle models were not uniform, as evidenced by the changes in component parts and design which resulted in significant differences in braking performance over the model years; applying Florida's class certification rule which is modeled on Federal Rule 23).

We are bolstered in our decision by numerous other rulings in products liability cases like this one that causation usually cannot be determined on a class-wide basis. *See, e.g., Sanneman v. Chrysler Corp.,* 191 F.R.D. 441, 449 (E.D.Pa.2000); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 F.R.D. 332, 347 (D.N.J.1997); *In re Ford Motor Co. Vehicle Paint Litig.,* 182 F.R.D. 214, 220 (E.D.La.1998); *Frosini v. Bridgestone Firestone N. Am. Tire,* No. CV 05–0578 CAS (RZx), 2007 WL 2781656, at *15 (C.D.Calif.Aug. 24, 2007). Because in our case "causation in regards to each claimed product remains a key determinative factor as to the legal cause of damages," *Jeld–Wen,* 250 F.R.D. at 695, and causation will necessitate the individualized inquiries described herein, we find that individual issues of fact predominate over those common to the putative class.[3]

---

**2.** We recognize that this determination was made by way of a Report and Recommendation to which objections have been filed. The issue will of course ultimately be decided by Judge Lenard.

**3.** Other claims raised in this case will require even more individualized proof. For example, with regard to the breach of express warranty claims, we conclude as did the court in *Cohen* that "[e]ven if reliance is not required [to be proven as an essential element of a breach of express warranty claim], individual factual issues would still predominate. Each putative class member would have to show that he or she was

injured as a result of the defendant's breach of warranty." 259 F.R.D. at 641–42. Further, each individual class member would have to show it provided notice to TCI in compliance with the express warranty. Whether proper notice was given is a highly individualized factual determination and depends on differing facts and circumstances. *Id.* The necessity of making individualized findings in connection with the express warranty claims supports our finding that individual issues predominate over common ones. And it cannot realistically be argued that Plaintiffs' fraud claims, laden as they are with highly individualized elements like detrimental reliance, are capable of being resolved on a

Similarly, we agree with Defendants that, as to the issue of damages, this case is wholly unsuited for class-wide treatment because common damage issues do not predominate. As noted, Plaintiffs have proposed a three-phase trial. They suggest that if liability is found in Phase 1, the same jury could determine entitlement to, and a formula for, punitive damages in Phase 2. Plaintiffs say the jury can reach a "common determination of reprehensibility" of the Defendants, which then can be applied as a "multiplier" to individual damages calculations during Phase 3. [D.E. 611 at 5]. In Phase 3, Plaintiffs envision a claims process along the lines of that employed in *Allapattah*. [*Id.* at 7–8].

■ Plaintiffs' proposal seeks to determine punitive damages prior to determinating compensatory damages, which is contrary to Florida law. "[T]he amount of compensatory damages must be determined in advance of a determination of the amount of punitive damages awardable, if any, so that the relationship between the two may be reviewed for reasonableness." *Engle v. Liggett Group, Inc.*, 945 So.2d 1246, 1265 (Fla.2006). This is because due process limits on punitive damages awards require "an evaluation of the punitive and compensatory amounts awarded to ensure a reasonable relationship between the two." *Id.* at 1264; *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 581, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (proper inquiry in evaluating a punitive damages award is " 'whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred") (emphasis in original). According to *Engle*, "without having total compensatory damages determined it would be impossible to determine whether punitive damages bear a reasonable relationship to the actual harm inflicted on the plaintiff." 945 So.2d at 1265 (trial court erred in allowing a lump sum determination of punitive damages for the entire class when compensatory damages had been determined only for the three individual class representatives) (internal citation omitted).

For similar reasons Plaintiffs' creative idea to bifurcate punitive damages' concern for "reprehensibility" from the actual measure of those damages makes it more difficult for the Court to comply with Fourteenth Amendment due process.[4] Plaintiffs unconvincingly explain how an individual class member's damage jury is supposed to apply the class-wide jury's reprehensibility finding without a damages trial that replicates most, if not all, of the evidence presented to the class-wide jury. Under Plaintiffs' trial proposal, because liability issues will remain to be decided after Phase 1, punitive damages may not be determined in Phase 2. This means numerous individualized determinations would still have to be made in Phase 3, including individualized determinations concerning liability and damages (including causation, damages, and affirmative defenses such as comparative fault) and the due process considerations concerning the amount of punitive damages to award. Even if a "multiplier" is used to determine punitive damages, the relationship between compensatory and punitive damages awarded to each putative

class-wide basis. Indeed Plaintiffs' memoranda pay little attention to their fraud claims for that obvious reason.

4. The reasonableness of a punitive damages award, for due process purposes, depends on the following three "guideposts:"
(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.
*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (citing *Gore*, 517 U.S. at 575, 116 S.Ct.

1589). The most important, though not the sole, "indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* The following factors are considered when determining a defendant's reprehensibility: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 419, 123 S.Ct. 1513 (citing *Gore*, 517 U.S. at 567–77, 116 S.Ct. 1589).

class member must be reviewed for reasonableness after individualized compensatory damages are determined. Moreover, the amount of harm to each putative class member must be determined on a case-by-case basis. *See Campbell,* 538 U.S. at 425–26, 123 S.Ct. 1513 ("The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff. . . . [C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."). The level of injury suffered by each class member clearly is thus quite material to this analysis, and that inquiry requires individual assessments that Plaintiffs too easily ignore.

Finally, the claims process itself would be unworkable in this case. This case is nothing like *Allapattah,* which serves as the model for the Plaintiffs' proposed claims process. That case involved purely contractual claims against a single defendant that were based on a uniform injury, as opposed to our case which involves warranty, product liability and other claims against several defendants that are based on different types of injuries. There, the claims process did not require a Special Master to decide liability issues. That determination had already been made; the only remaining issue was how to distribute the damages using a mathematical formula. *Allapattah,* 333 F.3d at 1258. Here, a special master cannot summarily decide causation and damage issues; a jury must do so in multiple trials based on disputed evidence.

Consequently Defendants are correct to distinguish *Allapattah* because our case "does not lend itself to a determination of liability and damages in the initial phases such that a final 'damages' phase would simply result in the formulaic allocation of damages." [D.E. 614 at 14]. Plaintiffs seek damages that must be determined on an individualized basis: for FlexPipe replacement, business disruption, and environmental remediation. Phase 3 would, therefore, necessarily include a determination of both liability and damages on a number of issues. Moreover, Defendants are entitled to challenge whether the damages claimed by a particular putative class member were the result of the so-called "uniform defect" or some other reason. Liability and damages for environmental contamination must be resolved on a facility-by-facility basis. The class action model proposed by Plaintiffs will require hundreds or more mini-trials on liability and damages in Phase 3. This clearly does not satisfy the streamlining and efficiency goals of Rule 23. *See Klay,* 382 F.3d at 1260 ("It is primarily where there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification."); *Dahlgren's,* 1994 WL 1251231, at *12 (damages that cannot be reduced to a simple formula but instead would require complex appraisal of thousands of individual claims would create staggering logistical problems).

For these reasons, we must conclude that, though the effort was valiant, Plaintiffs have failed to satisfy the predominance requirement. The highly individualized nature of each class member's claims proves to be too great an obstacle to certification of any class in this case.

## 2. *Superiority*

To achieve class certification, Plaintiffs must, in addition to satisfying the predominance prong, demonstrate that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The Rule sets forth four factors to consider in evaluating superiority, which balance in varying ways the benefits and costs of a class action to individual class members and to the Court.

Plaintiffs' superiority argument frames the issue thusly:

> At this juncture, the Court must determine whether it is procedurally superior (i) to try all of the common class-wide issues in *one* trial with damages issues determined subsequently on an individual, stream-lined basis only if necessary, or (ii) to try *all* of the liability *and* those same damages issues over and over and over again in thousands of individual separate trials.

[D.E. 618 at 2].

That argument is appealing at first blush but ultimately unravels. If the resolution of

658

this case could be achieved so simply, perhaps class treatment might be preferable. But given the predominance of individualized issues over common ones, particularly with regard to causation and damages, adjudicating claims against these Defendants on a class-wide basis would be far more complex than Plaintiffs suggest and would *not* be the most efficient method of doing so. "Given that adjudication of [some issues here, including causation and damages] on a class basis would still necessitate individual inquiries as described above, treatment of the claim as a class action would hardly be a superior method." *Cohen,* 259 F.R.D. at 625; *see also Jeld–Wen,* 250 F.R.D. at 696 (given predominance of individual issues, difficulties in managing the class action would be great).

This is not the type of case for which the class action device was created. The damages to individual class members here is potentially substantial, not de minimis. Absent certification, individual class members certainly have financial incentive to prosecute their individual claims. That incentive presents a real question whether a substantial number of class members may opt out of this action. Whether or not that ultimately turns out to be the case, this factor weighs against certification under Rule 23(b)(3)(A). *See, e.g., Zinser v. Accufix Research Institute, Inc.,* 273 F.3d 1266 (9th Cir.2001); *In re Northern Dist. of Cal. Dalkon Shield IUD Products Liab. Litig.,* 693 F.2d 847, 856 (9th Cir.1982) (strong incentive for class members to pursue individual suits favors denial of certification).

Moreover, the greatest factor that weighs most against the superiority of a class device in this case is the difficulty in managing the litigation. *See* Fed.R.Civ.P. 23(b)(3)(D). As discussed above, the resolution of this litigation will likely not be accomplished with one trial. Certain liability issues may be decided in one trial, but the critical causation and damage questions will require multiple individual trials involving different class members and defendants. Those trials cannot simply be presented on the paper record to a Special Master. They must be presented through testimony and evidence before a jury. The class action determinations will not relieve this Court from having to adjudicate a slew of individual cases, including many which could not be brought in this jurisdiction on their own, increasing the judicial resources expended by this Court.

In short, in our view class treatment is not superior to other litigation devices that are available to all class members. The class action procedure makes this complex products liability action even more complex than necessary. We do not share Plaintiffs' simplistic view of the superiority of the class action device in this case.

Therefore, we find that Plaintiffs have also not met their burden as to this prong of Rule 23(b)(3).[6]

### *III. CONCLUSION*

Based on the foregoing, the undersigned Magistrate Judge recommends that Plaintiffs' Motion for Class Certification [D.E. 441] be **DENIED.**

Pursuant to Local Magistrate Rule 4(b), the parties have ten days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hall-*

---

5. In the event a class is not certified pursuant to Rule 23(a) and (b), Plaintiffs suggest alternatively that a class be certified pursuant to Rule 23(c)(4). That Rule suggests that a class may be certified for isolated issues in a given case. We doubt, however, that Plaintiffs' inability to satisfy the predominance and superiority factors ever allows the Court to rely on Rule 23(c)(4). But, even if we could, for the reasons articulated above, particularly the need to try causation and damages on an individual basis here, we decline to recommend that such a course be taken. No single issue is best addressed on a class-wide basis involving multiple variations of the Flex-Pipe product and multiple defendants.

6. In light of our determination *supra* that Plaintiffs have failed to meet all the Rule 23 requirements for certification, we will not address the allegations made by various Defendants that the class definition is overbroad and vague.

*mark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir.1993); *LoConte v. Dugger,* 847 F.2d 745 (11th Cir.1988); *Nettles v. Wainwright,* 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

Nov. 30, 2008.